## CORALIE TORRES

**From:** Terri Cowgill <terricowgill@hotmail.com>
**Sent:** Saturday, June 30, 2018 10:38 PM
**To:** JANEL GRIFFIN
**Subject:** 846-2016-24046C

Dear Ms. Griffin:

After reviewing the Company's Position Statement, it appears that they have submitted to you the same information that they sent to DLLR and the same information that I sent to your office in my original charge. At this time, I will use this opportunity to comment, clarify and correct some of the statements made in the Position Statement.

1) The Statement claims that my charge was not filed until August 2017. That is incorrect. My charge was filed in June of 2016.
2) Regarding the reduced work schedule, it was approved on paper. However, my schedule was never reduced. Therefore, this will disprove the statement made later in the Position that "the Company fully accommodated my alleged disability".
3) The amended FMLA paper work was done at First Data's request. As previously stated, I was getting conflicting information from my manager, Leave Management and Human Resources.
4) Please do not accept First Data's attempt to smooth over the Final Warning for attendance. This was not just "simply overlooked" and done "erroneously". This was their second attempt to intimidate and harass me. The first being the FMLA paperwork. Now, allow me to explain their call out procedures, which is a two step process.
    a) First, I must call their automated system to put myself off of the schedule.
    b) Second, I must call my Manager or leave a message on her voicemail advising why I am not available to work. I must specifically state FMLA as the reason.

This information is available for you to view on the Leave Management approvals. I find it highly unlikely that on a day that I leave early, designating it as FMLA, that my manger could have "simply overlooked" this, and created a Final Warning the exact same day. So, even though First Data had a paper (at their request), signed by my doctor dated January 29, 2015 saying that I should have been excused, and even though First Data claims to have approved it, if you review the Aspect Absence Report (my page #12), the dates stated on that Final Warning are marked ABS (which is absent), and not marked as FMLA as they should have been.

The Final Warning was "promptly rescinded" is an understatement. If you compare my signature on that Final Warning to the signature on the 90 day IAP for conduct, you will notice a considerable difference. To be honest, I was beyond livid. I was in no way unprofessional (raising my voice or cursing). Otherwise, First Data could have fired me for insubordination. However, after butting heads with my manager as she threatened my job multiple times, I did sign the paper, (not agreeing to it, but acknowledging it). I then advised her that she was touching on legal issues and that I would be taking this to Human Resources. She then scheduled a meeting with Annette Wood, HR. As I sat across the desk from Annette, I advised her that I was getting the "run around" regarding the FMLA paperwork and that now Dawn was threatening me with my job. Annette either called Dawn (or pretended to call her). She then came back and first advised me that the FMLA paperwork is not the "wrong form", that it was just filled out incorrectly by my doctor. She then went on to tell me that Dawn vouched for me, and "because I was such a good rep" that she was going to "erase" this Final Warning. To wrap up our meeting, Annette then offered me a piece of advice. She advised me something

1

to the effect of "you need to do whatever you have to do to hold onto your job". So you see, this was not a "simple error" that was "promptly rescinded". This was again, an attempt to intimidate and harass me that was "rescinded" only after I had to endure their threats about my job, and then remind them both that FMLA is a protected act.

5) The Position Statement is correct that I was never issued any other corrective actions related to attendance. Instead, my manager Dawn Rowe and the HR representative Annette Wood moved on to what First Data considers "quality". Quality is not black and white. In fact, many of the managers there, including my own, have stated that it is very "subjective". For this reason, a representative who does not agree with their scoring is allowed to dispute it. They can either sit down with the QA (quality analyst) who did the scoring, or they can have a second manager listen to the call and give their opinion. I was not given an opportunity to dispute either call in question.

6) Regarding the July 2015 call, First Data contradicts themselves by claiming that I became "rude and argumentative", and then stating that I told the caller "I'm not going to argue with you". I did make a direct statement to the caller advising her that I was not going to argue with her. So whether I argued with her, or whether I made a direct statement is subjective. As for this call "being discovered through the Company's regular quality control practices", that statement could not be more untrue. If you note the timeframe for the events of this call you will see

    a) The call was monitored on July 10th, 2015.
    b) The IAP was not created until July 28th, 2015.

- c) The call was not discussed with me until August 4th, 2015.

So, the "regular" process is that we get our monitorings within 24-48 hours. Dawn Rowe even put out an email about the 24-48 hour timeframe. This call was searched for and is considered subjective which is why First Data chose to use it. However, if you go back to the Position Statement, it advises that "First Data maintains a policy prohibiting call avoidance, which requires representatives to conduct themselves in a professional manner and avoid any type of action which affects the Company in a negative fashion or jeopardizes its relationship with customers and clients". I took a large volume of calls per day. I not only handle my department, which is disputes, but I am also trained to take customer services calls for all of the banks that we process for, and I also assist the tech desk when needed. So, I find it highly unlikely that if I was indeed "rude and unprofessional" that my manager would wait almost a month to discuss this with me. That is a lot of customers and clients that I could have "jeopardized". If you review that IAP under the Expectation/SMART Goal, it states that my manager and I would meet on a weekly basis to review a recorded call and discuss any opportunities that may arise. We met 1 time on August 13, 2015 for what First Data refers to as "coaching". In that meeting, the "coaching" that was offered to me by my manager was something to the effect of "play pretty". Never again did we meet to discuss this call.

7) On August 4th, 2015, Leave Management sent me a recertification notice on my FMLA. I do not believe that this was a coincidence that I was given a recertification notice and a 90 day IAP on the exact same day. This was First Data attempting to coerce me regarding the recertification.

8) The statement that I "intentionally transferred the client to the after-call survey without first providing him with any customer service", is both incorrect and absurd. I, as a representative do not transfer the call, First Data's phone system is (or was at that time), automatically set up to transfer the call to the survey. Why would I intentionally transfer a call to a survey without offering any type of customer service, knowing full well, that I would not get a good rating from the caller? Before I explain what took place on that particular call, let me advise you of First Data's "Call Handling Procedures". The procedures state that "if a call comes in and the caller has you on hold, you are to wait 1 minute, or 3-5 minutes if the account has populated and you can see that the caller has already called that day. Use your best judgement". When this call came in, I was on

2

hold. I could hear a male voice in the background who seemed to be on a different phone. After giving my "call opening" three times (which is what I am required to do), I put my phone in ACW (after call waiting). I did this because if he hung up the line that I was on, another call would have come through before I got the opportunity to note the account (which is also a requirement under First Data's "call handling procedures"). When I reviewed this call with my manager, the call lasted 26 seconds. Paperwork submitted to DLLR stated that the call lasted 29 seconds. Regardless, this was the caller's first contact with us that day. Therefore, according to First Data's own procedures, I only had to wait 1 minute. I do believe that I followed their procedures and waited at least 1 minute before releasing the call and noting that no one was on the line when the call came in. I also believe that there is more to that call than what was played for me. I believe this, because if you review the IAP issued back in July, under the section that explains what "call avoidance" is, you will notice that the second example is "not answering the call". I think that common sense would be that before you can "close a call" or release it, you have to actually "open the call", or take it. I believe that I did give a call opening, otherwise, they would have failed me for this and yet they did not. I now refer you to page #26 of my original charge (which is the Fact Finding Report done by DLLR). Under Employer Rebuttal, First Data would not provide a recording of this call. However, what they did attempt to do was deceive DLLR by mixing the two calls together. I made DLLR aware of this, and then, when they sent them a scheduled telephone hearing to address the discrepancies, First Data did not participate in it.

9) I agree that First Data should take "call avoidance" seriously and continue to terminate individuals who engage in that type of behavior. However, this was not call avoidance. I did not know who the caller was (we never spoke). This was nothing personal with me disconnecting him. I was simply doing my job and following First Data's "call handling procedures". Also, just to make you aware, if I recall correctly, this call was taken at mid morning and I continued to take calls for the rest of the day, so I was not trying to get out of doing my job.

10) As for my termination being "wholly unrelated to my alleged disability", I strongly disagree. Allow me to recap the order of events.

    a) January 26, 2015-FMLA approved
    b) February 11, 2015-Final Warning for Attendance created
    c) August 4th, 2015-FMLA recertification sent
    d) August 4th, 2015-90 day IAP given
    e) August 20, 2015-FMLA approved
    f) September 14, 2015-terminated

11) I also disagree with the statement that "the Company at all times fully accommodated Complainant's need for intermittent leave". As previously stated First Data never reduced my work schedule.

12) First Data's attorney feels that I have "failed to establish a prima facie case of disability discrimination". Again, I strongly disagree with that statement. I feel that not only did I establish a prima facie case of disability discrimination, I have established a case of harassment, intimidation and coercion as well.

    a) I was a member of the protected class
    b) I did suffer from an adverse employment action
    c) First Data claims that I was fired for misconduct. DLLR has already determined that their evidence failed to prove any degree of misconduct. Therefore, the only other corrective action on me by First Data, was the Final Warning for attendance that they now want you to believe was "simply overlooked" and done "erroneously".

The remainder of that paragraph is repetitive and has already been addressed.

13) I believe that my year-end assessment and mid-year review prove First Data's attorney wrong on the statement that I was not qualified for my position.

14) My "call avoidance behaviors" had everything to do with my "alleged disability" and termination. The Final Written Warning for attendance (page #10) of my charge, states how "imperative" it was that I be at work,

3

and how it impacts the business when I am out. My original charge also advised that First Data had already enforced mandatory overtime in late 2014 to compensate for their firings, and their downsizing/offshoring project. First Data just had to come up with a bogus reason for my termination, since FMLA is a protected act. I feel that the statement that "Complainant cannot prove that, but for her alleged disability, she would not have been terminated" was proven when DLLR found their "misconduct or gross misconduct" claim to be unfounded, leaving the only other issue that First Data had with me as my disability. Besides, the very first page of my original charge, (page #1) advised that they addressed performance issues through terminations in October 2014. I presented my year-end assessment (page #2) done in December 2014, showing that I was "meeting or exceeding" First Data's expectations. I believe that the evidence of pretext was shown when they switched the reason to terminate me from attendance to conduct.

In closing, I would like to correct my hire date to July 5th, 2004. I worked for First Data for over 11 years, and I would like for you to know that you do not survive there if you are "rude and unprofessional". The 2014 year end assessment (page #2) submitted in the initial charge, reflects my "quality" scores. I realize that it is difficult to read, but it does show that my quality customer was 96.99 percent, and my quality business was 93.40. I believe at that time, that 85 percent was the required expectation. The mid-year review done in 2015 (page #16), also shows that I was meeting the quality expectations. My point being, that I was a good representative, and I just did not "go bad" overnight. My problems did not start with First Data until they enforced the mandatory overtime, and I had to use FMLA. That is what upset them. I hope that I have provided you with enough information so that you now have a clearer picture of what was actually going on at First Data. Should you need more information, or have any questions regarding my rebuttal, please contact me

Sincerely,

Terri Cowgill