```
1   TERRI COWGILL,                  IN THE

2          Plaintiff,               UNITED STATES DISTRICT
                                    COURT
3
    vs.                            FOR THE DISTRICT OF
4                                  MARYLAND
    FIRST DATA TECHNOLOGIES, INC.,
5
           Defendant.              CASE NO.
6                                  1:19cv-02565-ADC

7   _____/

8

9

10          The deposition of TERRI COWGILL was held on

11  Friday, August 21, 2020 commencing at 9:47 a.m. at the

12  Regus, Westview Village Business Center,  5100

13  Buckeystown Pike, Frederick, Maryland  21704 before Eric

14  Leichter, Notary Public.

15

16

17

18

19

20

21  REPORTED BY:  Eric Leichter
```

**EXHIBIT B**
to Deft's Motion for
Summary Judgment

```
1    APPEARANCES:

2

3         PRO SE:

4         TERRI COWGILL

5             121 East North Street

6             Waynesboro, PA, 17268

7             717-762-4489

8             terricowgill@hotmail.com

9

10        ON BEHALF OF THE DEFENDANT:

11        CHARLES B. JELLINEK, ESQ.

12            Bryan Cave Leighton Paisner LLP

13            211 North Broadway, Suite 3600

14            St. Louis, MO, 63102

15            314-259-2000

16            cbjellinek@bclplaw.com

17

18

19

20

21
```

```
 1                        INDEX

 2              Deposition of TERRI COWGILL

 3                    August 21, 2020

 4

 5  Examination by:                          Page

 6  Mr. Jellinek                                5

 7

 8  Exhibit No.                            Marked

 9  Exhibit 1  Complaint                       25

10  Exhibit 2  Application                     38

11  Exhibit 3  Application                     46

12  Exhibit 4  Charge                          53

13  Exhibit 5  Phone procedures                81

14  Exhibit 6  90-day improvement action plan  89

15  Exhibit 7  Customer survey                 116

16  Exhibit 8  Leave Management's response     152

17  Exhibit 9  FMLA paperwork                  156

18  Exhibit 10 FMLA recertification            161

19

20

21
```

```
1                    PROCEEDINGS,

2              THE VIDEOGRAPHER:  This is the videotaped

3   deposition of Terri Cowgill taken in the matter of Terri

4   Cowgill v. First Data Technologies, Inc. filed in the

5   United States District Court for the District of

6   Maryland, case number 1:19-CV-02565.  The deposition is

7   being held at Westview Village Business Center on August

8   21st, 2020.  My name is Charlie Weidner from Ellen

9   Grauer, a US legal support company, and I am the video

10  specialist.  The court reporter today is Eric Leichter,

11  also from Ellen Grauer, a US legal support company.  We

12  are going on the record at 9:47 a.m.  At this time, will

13  counsel please state their appearances for the record?

14             MR. JELLINEK:  Charles Jellinek with the

15  Bryan Cave Leighton Paisner Law Firm for the defendant.

16             THE WITNESS:  Terri Ann Cowgill, Plaintiff

17  pro se.

18             THE VIDEOGRAPHER:  Will the court reporter

19  please swear in the witness?

20  Whereupon,

21                    TERRI COWGILL,
```

```
 1   called as a witness, having been first duly sworn to

 2   tell the truth, the whole truth, and nothing but the

 3   truth, was examined and testified as follows:

 4             EXAMINATION BY MR. JELLINEK:

 5        Q    Good morning, Ms. Cowgill.

 6        A    Good morning.

 7        Q    Am I saying your name correctly?  Cowgill?

 8        A    Yes, you are.

 9        Q    All right.  We were introduced a couple

10   times.  We've spoken on the phone a few times, we've

11   corresponded by e-mail, and of course, I introduced

12   myself to you this morning before we went on the record.

13   But I'll do so for the record now.  My name is Charles

14   Jellinek.  I'm an attorney with the Bryan Cave Leighton

15   Paisner Law Firm located in Saint Louis, Missouri, and

16   my firm and I have been retained to represent First Data

17   in a lawsuit that you have filed against them as

18   denominated at the start of this deposition by the

19   videographer and I'm going to be taking your deposition

20   today.  I'm going to go over a few preliminary matters

21   and instructions just to make sure that the deposition
```

Terri Cowgill
08/21/2020

```
 1    First Data.  Correct?

 2         A      Correct.

 3         Q      And that your supervisor was Dawn Rowe?

 4         A      Correct.

 5         Q      R-O-W-E?

 6         A      Yes, she pronounces it Rowe.

 7         Q      Okay.  And you listed your salary there as

 8    $29,120?

 9         A      Correct.

10         Q      Was that your salary at the time of

11    separation?

12         A      At the time of separation?

13         Q      Yeah.  On September 15, 2015.

14         A      I don't know.  In September --

15         Q      Go ahead.  I'm sorry.  I didn't interrupt

16    you.

17         A      No, that's okay.  You said on September

18    15th of 2015?

19         Q      Yeah.  At the time you left.

20         A      I believe it was 30 or 32, but I don't have

21    that information in front of me.
```

1    was some other things that I corrected, too.

2          Q     Okay.  So this is the charge that you filed

3    with the EEOC?

4          A     Correct.

5          Q     That's your signature on this document?

6          A     Correct.

7          Q     And it's dated August 17th, 2017?

8          A     August 17th, 2017.  Correct.

9          Q     And your testimony is that the narrative in

10   typewriting there in the particular section of page 1 of

11   Exhibit 4, that that was typed by the EEOC?

12         A     Correct.  All of it was.

13         Q     Okay.

14         A     Part 3, also.

15         Q     All right.  So that was information that

16   you provided to them, but you think they got that wrong

17   or made a typo?

18         A     Correct.

19         Q     All right.  And you corrected that.  Your

20   actual start date was July 5th, 2004?

21         A     Correct.

1          Q       Okay.  And your position at the start or

2    the outset of your employment with First Data was what?

3          A       Back then, they called us customer service.

4    I was a customer service rep for PNC and Bank of Hawaii.

5          Q       All right.  You were a customer service

6    representative --

7          A       For PNC Bank and Bank of Hawaii.

8          Q       Great.  And you worked in the Hagerstown,

9    Maryland facility?

10         A       Yes, sir.

11         Q       And the entire time you worked for First

12   Data, you worked in the Hagerstown, Maryland facility?

13         A       Yes, sir.

14         Q       At that location, what did First Data do?

15   What was the business of First Data?

16         A       They're a payment processing company.

17         Q       First Data is a payment processing company?

18         A       Correct.

19         Q       And what is your understanding of what that

20   means?

21         A       They process credit and debit transactions.

1    Some of them, they authorize.  Some of them, they

2    actually fund the customers.  They complete, I guess,

3    the whole credit and debit card transaction.

4         Q     All right.  So if I'm Charles Jellinek's

5    Quickie-Mart and I sign up with First Data, they would

6    be my payment processor and when customers came into my

7    Quickie-Mart and used a credit card or a debit card,

8    First Data would process that payment?

9         A     The customer would swipe their card, the

10   point of sale equipment would reach back to the issuing

11   bank or First Data, depending on how the card was set

12   up, and it would either say decline the transaction or

13   approve the transaction.  If it was approved, then it

14   would go back to the actual merchant saying that your

15   card was okay, that you can have the merchandise or what

16   have you.  And then First Data, if they funded you, they

17   would go ahead -- or funded the business, they would go

18   ahead and pay the business.  Or if they did not, if it

19   was the issuing bank that funded you, First Data would

20   fund you and reach back to the issuing bank to get the

21   payment.

1        Q       Got you.  All right.  So what -- if the

2    Hagerstown -- so that being the general nature of the

3    business for First Data, what was the -- what was

4    happening or what were the operations at the Hagerstown,

5    Maryland facility?  What was happening at that facility

6    as part of the transaction process or the business

7    generally?  What did you all do there?

8        A       Customer service was located there,

9    chargebacks or disputes.  But no, you understand like

10   First Data has customer service and disputes elsewhere

11   also.  So like, they had customer service in Florida.

12   They had customer service in Omaha.  So it's not

13   strictly that.  Settlement ops was there.  They had a

14   human resources department.  The tech desk was there.

15   The authorizations department was there.  Point of sale

16   was there.

17       Q       And what business or department did you

18   work in?

19       A       I originally was customer service.

20       Q       And how long did you work in customer

21   service?

Terri Cowgill
08/21/2020

58

```
 1        A       I don't recall.  I want to say maybe six

 2   months, but that's a guess.

 3        Q       Did you move to a different department

 4   after six months?

 5        A       Yes, I did.

 6        Q       Into what department?

 7        A       The chargeback department or disputes.

 8   Whatever you call it.

 9        Q       And did you -- after transferring to the

10   chargeback department or disputes department, whichever

11   it's called, did you stay in that department for the

12   remainder of your time with First Data?

13        A       I did.

14        Q       Okay.  Do you recall approximately what

15   year you moved into the chargebacks/disputes department?

16        A       No, but it was in that information for

17   status.  I wasn't in customer service, I don't think,

18   long.

19        Q       Okay.  So the bulk of your time with First

20   Data was spent in the chargebacks department and

21   disputes?
```

Terri Cowgill
08/21/2020

```
 1         A       Correct.

 2         Q       All right.  And what is happening in that

 3   department?  What's the business function or purpose of

 4   that department?

 5         A       That is when a credit card is billed, it

 6   can be disputed by the issuing bank or it can be

 7   disputed by the actual cardholder.  So if you walked

 8   into a business and swipe your credit card, or if you

 9   don't even authorize a business to bill your card, you

10   can dispute it for that.  We handle whenever there's a

11   credit card transaction in question.

12         Q       All right.

13         A       Either disputed by the issuing bank or

14   disputed by the actual cardholder.

15         Q       All right.  And what was your role in

16   addressing or responding to disputed credit card or

17   debit card transactions?

18         A       Well, I was a phone representative

19   addressing them.

20         Q       Okay.  So who would be calling you?  Who

21   calls the phone reps in the chargebacks department or
```

1   disputes department with the issue?

2         A       Either the businesses, or the issuing

3   banks, or like other departments within First Data, like

4   relationship managers might call and want to know what's

5   happening with it.  Security, fraud, risk management,

6   they would call because they had funds on hold to see if

7   they could release the funds if the dispute had been

8   settled.  What First Data calls the ISOs or the I-S-Os,

9   which is the independent sales organizations, the people

10  that sell the point of sale equipment for them.  And I

11  mean, I'm -- we sometimes got calls from the actual

12  cardholder themselves and we'd have to tell them that we

13  couldn't speak with them and refer them to the bank that

14  issued the credit card.

15        Q       So give me -- give me an example of a type

16  of call that you might get from a business regarding a

17  chargeback or a dispute.  What would be kind of a

18  regular standard call you might get for the business?

19        A       They received a chargeback and would want

20  to know, first of all, did the funds come out of their

21  account -- a chargeback or a retrieval because they were

1          Q       And how does -- how does the business

2    receive that notification?

3          A       When I left there, it was by mail or they

4    could sign up for the online service and see them

5    online.

6          Q       Okay.  So once a business would get a

7    either retrieval request or perhaps a chargeback

8    notification, they might reach out to the Hagerstown

9    chargeback department or disputes department to find out

10   what's going on and ask questions about that.

11         A       Correct.

12         Q       And your role as a representative in that

13   department would be to receive calls and then try to

14   respond to the merchant's inquiries regarding those

15   inquiries.

16         A       Correct.

17         Q       Okay.  And if it was a customer, the

18   ultimate person who made a purchase from that business,

19   if they called you, you would decline to talk to them

20   and say you need to call your bank?

21         A       Correct.

1     Q       Other people you might talk to might be the

2   bank themselves?

3     A       Correct.

4     Q       And what type of inquiries would you get

5   from the issuing bank?

6     A       They would -- like if it was an account

7   getting a lot of chargebacks, they would try to figure

8   out why they were getting a large -- a lot of

9   chargebacks.  If the actual bank suspected fraud, they

10  would ask were the chargebacks coming in for fraud.

11  What the merchant -- sometimes they would call on behalf

12  of the actual business what they needed to do in order

13  to renegade the chargeback.

14    Q       Okay.  So again, they would be calling you

15  as kind of a point of contact, initial point of contact

16  regarding a chargeback issue or a series of chargebacks.

17  If they have questions regarding a particular one,

18  suspected fraud, or if they had instructions that needed

19  to go back to the merchant in order to process the

20  chargeback.

21    A       Yeah.  We got a lot.  I guess the issuing

Terri Cowgill
08/21/2020

66

1    First Data point of sale equipment into a merchant?

2         A      Correct.

3         Q      And so the merchant might have reached out

4    to them with a question or an issue and if they didn't

5    know, they would call you as a first point of contact to

6    receive information or questions regarding chargebacks

7    or disputes.

8         A      Correct.

9         Q      So in essence, you're on the phone all day

10   fielding calls from these various potential callers

11   whether they're the merchants who were using First

12   Data's point of sale equipment, the banks who were

13   processing the transactions for the merchants with First

14   Data, your own internal departments at First Data as

15   well as the ISOs.

16        A      Correct.

17        Q      And if I were putting a general statement

18   on this, the Hagerstown facility chargeback department

19   disputes group that you worked in was a call center

20   environment.  You were receiving calls and addressing

21   concerns and questions from those various constituents

Terri Cowgill
08/21/2020

1    in the process?

2          A       That is correct.

3          Q       And within the chargeback department or

4    disputes department, was it divided up into groups or

5    subdivisions in any way?

6          A       It wasn't -- I mean, the chargeback

7    department itself was considered a group.

8          Q       Uh-huh.

9          A       But we each had our own separate desk with

10   like a little wall between us.

11         Q       You said kind of in a classic call center

12   environment?  A little desk with a cube kind of

13   environment where you have a phone, your terminal system

14   in front of you to look things up and address questions,

15   and your chair.

16         A       Correct.

17         Q       Okay.  And did you work at a particular

18   unit or were they organized by -- so that was a group or

19   a department, the chargeback department, but were you in

20   teams or anything like that?

21         A       No.

1       Q       There's just one chargeback --

2       A       Well, they had it like a day shift group

3  and a night shift group.  So I mean if we had like

4  little competitions or whatever, then that's what you

5  might be referring to is the team.

6       Q       Okay.  And you were on the day shift?

7       A       Correct.

8       Q       And how many folks -- and at that time when

9  you were working in the chargeback or disputes

10  department at the Hagerstown, Maryland facility, how

11  many people were in that department?

12      A       On those shifts, you're asking?

13      Q       Yeah, on your shift approximately.

14      A       I'd say maybe 36.

15      Q       Okay.

16      A       It was never really large.

17      Q       And who did you report to?

18      A       Dawn Rowe.

19      Q       Did everyone report to Dawn Rowe?

20      A       No, there was another manager.

21      Q       Okay.  There were two managers over that

1   shift?

2          A       No, they had a day shift manager and a

3   night shift manager.

4          Q       Dawn was the day shift manager?

5          A       Correct.

6          Q       And so were the 36 people divided up

7   equally between day and night?

8          A       I don't know if it was equally, but they

9   were divided up.

10         Q       Who was the night shift manager?

11         A       When I left, I want to say Joleen, but I

12  can't tell you.  I don't remember that because I didn't

13  normally work night shift.

14         Q       On day shift, how many folks worked

15  approximately with you under Ms. Rowe?

16         A       Maybe 15 or 20.

17         Q       Okay.  And did you work a set schedule?

18         A       My shift was supposed to be set if that's

19  -- is that what you're asking me?  And then they have

20  the mandatory overtime.  I believe at the time I left

21  there, I was supposed to work 9:30 to 5:00.

1      Q      Okay.  And from time to time, they would

2   require overtime?

3      A      Correct.  And they also offered what they

4   called undertime.  If it was slow and they'd popped up a

5   schedule and say who wants to leave at 1:00 o'clock?

6   You could sign up to leave at 1:00 o'clock.

7      Q      Okay.  And how -- for how many years were

8   you working under Dawn Rowe's supervision in the

9   chargeback and disputes department?

10     A      I'd say the whole time with the exception

11  of maybe two to three years because I had at least two

12  other managers in that department I can think of.  But

13  again, I don't recall that exact number.

14     Q      Okay.  And if you separated from First Data

15  on September 15, 2015, how far going back had you been

16  reporting to Dawn Rowe?  The number of years.  I guess

17  to put it another way, had she been your supervisor for

18  the last five years before you left?

19     A      Oh, at least the last five years.

20     Q      Okay.

21            THE WITNESS:  Can we do a bathroom break

Terri Cowgill
08/21/2020

```
1    and you said it had been at least the last five years,

2    probably longer, and that you had worked in a -- on the

3    day shift in the disputes and chargeback department,

4    reported to Ms. Rowe with approximately 15 to 20 others,

5    depending on staffing.  So, refresh your recollection

6    where we were at?

7         A     Yes, sir.

8         Q     And did I state all that correctly?

9         A     Yes, sir.

10        Q     All right.  When you performed your job as

11   -- what was your position/title at that time when you

12   were working in chargebacks and disputes?  Was it

13   customer service rep still or --

14        A     Well, I had different -- they had different

15   levels.  We were in the beginning known as customer

16   service reps, and I think it was when Frank took over

17   that we became customer service associates or -- so,

18   they had levels, and I was a senior.  I believe it was

19   level one, two, and three, but I'm not.  It -- it

20   changed a lot, the names and the titles and --

21        Q     Okay.  Well for purposes of this
```

1   deposition, in the 2015 time frame, what do you

2   understand your -- your position/title was?

3       A       Senior account specialist.

4       Q       Senior account specialist?  And your role

5   as a senior account specialist was as we described

6   before -- fielding calls from the merchants, from the

7   banks, from the ISOs, and from other internal First Data

8   departments to resolve chargeback and dispute issues and

9   queries.  Correct?

10      A       Yes.  But as a senior representative, I

11  still had to take customer service calls and the tech

12  desk.

13      Q       Okay.  Those were other calls that would be

14  coming in regarding different areas?

15      A       Correct.

16      Q       And what type of -- the other two

17  departments, you said tech desk was one?

18      A       Correct.

19      Q       And what was the other?

20      A       Customer service.

21      Q       And so who would -- what type of calls

```
 1        A     Correct.

 2        Q     Senior of account -- what was it?

 3        A     I think sometimes they called in senior

 4   account specialist, and sometimes they called it senior

 5   contact customer service rep.

 6        Q     Okay.

 7        A     So --

 8        Q     But the -- regardless of what they called

 9   it, the function of your role was largely what you've

10   described to me --

11        A     Correct.

12        Q     -- here at this deposition?

13        A     Correct.

14        Q     Okay.  And, obviously, to do this job, you

15   would receive training?  You would get updated on how

16   these -- how the systems work, how chargebacks work.

17   That happened from time to time?

18        A     Well, I got training when I originally

19   started.

20        Q     Okay.

21        A     And then I got training when I went to
```

1    chargebacks.  And then I did receive like a couple of

2    days' training when I assisted the tech -- test [sic] --

3    tech desk.  But it wasn't like, you know, updated

4    training.  Most of the updates was stuff we received

5    online and we had to do.

6         Q     Okay.  There was online modules that you

7    had to review, confirm you understood, and show

8    proficiency at and that you would be set to take calls

9    on that area?

10        A     Correct.

11        Q     Okay.  How was your performance measured?

12        A     Well, I didn't know until I received the

13   EEOC file.  Apparently, it was based on a one to three

14   level.

15        Q     Okay.  Were -- were the folks in your role

16   who worked in chargebacks, manning phones -- were they

17   given instructions on, you know, how to interact with

18   customers, how to handle the calls, what was expected of

19   you as far as time of the call, avoiding holds, that

20   type of thing?  Were there instructions around it?

21        A     Yes, sir.

```
 1        Q      Okay.  How were those instructions

 2  communicated to you?

 3        A      The majority of 'em, I believe, were

 4  online.

 5        Q      Okay.  And where were those online?

 6        A      They used a system called MyRT, M-Y-R-T.

 7  They used a system called DRRS.  They were in the

 8  process of switching over to SharePoint as I was

 9  leavin'.

10        Q      Okay.  So, as the company --

11        A      Oh --

12        Q      Go ahead.  I'm sorry.

13        A      I'm sorry.  I was gonna say our main one

14  was MyRT, M-Y-R-T.

15        Q      All right.  And so if the company had

16  instructions for you on how they wanted you to handle

17  your job as far as receiving and handling calls, that

18  would be uploaded to MyRT and you could -- they would

19  say, hey, there's been an update on how we want you to

20  do this or whatever, but the instructions were there?

21        A      That -- correct.  That was the actual call
```

Terri Cowgill
08/21/2020

79

1    process.  Now what they expected from us, that was

2    normally done in a meeting or what they called a

3    one-down or a one-on-one.

4         Q      Okay.  Can you tell me that about the

5    meetings, the one-downs or the one-on-ones?  What --

6    what were those?

7         A      That was like telling each person like,

8    this is your handle time.  This is your hold time.  This

9    is what your compliance has to be.

10        Q      And what does that mean, handle time?

11        A      The time it takes you to handle a call from

12   the time the call comes in until it's released.

13        Q      Okay.  And then what is hold time?

14        A      How long you have a merchant on hold or if

15   there's a hold, like if a call comes in and I don't

16   answer it right away, how long they're allowed to hold.

17        Q      Obviously, they don't want the merchants,

18   their clients holding for a long time.

19        A      Correct.

20        Q      That impacts business.  They wanna be

21   responsive to their customers.

1      A      I don't -- I think -- I -- it's my opinion

2   that First Data wants you to think that, but I don't

3   think that's what they honestly believe.

4      Q      Okay.  Well, it was certainly communicated

5   to you that you should give prompt, efficient, polite,

6   and courteous service.  Correct?

7      A      Correct.

8      Q      And that was communicated to you both in

9   documents on MyRT and training materials and in

10  one-on-ones and one-downs.  Correct?

11     A      Correct.

12            (Cowgill Exhibit 5 was marked for

13  identification.)

14     Q      Ms. Cowgill, I'm gonna hand you a document

15  which had been marked for purposes of this deposition as

16  Exhibit 5. Please take a moment to look this document

17  over and let me know when you're finished 'cause I will

18  have some questions for you regarding Exhibit 5.

19     A      I'm finished.

20     Q      Okay.  Have you seen this document before?

21     A      I do not recall ever seeing this document.

1      Q      Okay.  Have you ever seen anything that

2   looks like it?

3      A      No.  The phone procedures are in that

4   system I just told you, MyRT.  I believe you told me in

5   the request for production that this was a slideshow or

6   something done in January.

7      Q      Okay.  But you don't recall ever seeing

8   this document?

9      A      No, I do not.

10     Q      Okay.  Did anybody at the company ever

11  provide you any documents or any instructions where this

12  content was reviewed with you?

13     A      Not that I recall.

14     Q      Okay.  Well, did anyone ever tell you that

15  -- that deliberately hanging up on a customer is against

16  your job instructions?

17     A      This information is off of their IAPs,

18  their improvement action plans.

19     Q      All right.  Did anyone ever discuss with

20  you what call avoidance meant?

21     A      Correct.

1      Q      Was that in MyRT?

2      A      Correct.

3      Q      What did you understand what could

4   constitute call avoidance?

5      A      Sitting with my -- well, first of all,

6   sitting in after call waiting, meaning that another call

7   couldn't come into your phone because you were just

8   sitting there.  Gosh.  Logging out of your phone

9   unnecessarily.  I believe at one point, we had 10

10  seconds to answer the call, but that's more or less what

11  can -- First Data considers call opening.  I believe at

12  one point it was 10 seconds to answer the call, and then

13  I think they bumped it down to seven.  It was doing

14  anything, more or less, that you could do to get out of

15  taking a call, either logging out of your phone or

16  sitting in after a call or needlessly hanging on the

17  phone.  Like if I transfer him to another department and

18  I sit there and listen to what the person in the other

19  department's talking to him about.  There is no reason

20  for me to hang on the line.

21     Q      How about releasing a call prematurely?

1        A       Yes.

2        Q       Were you counseled or were you given

3    instructions that you were to provide courteous service

4    to customers?

5        A       Correct.

6        Q       Were you told to avoid inappropriate

7    language?

8        A       Yes.

9        Q       Were you told not to raise your voice?

10       A       I don't recall that.

11       Q       Okay.  Were you told not to become

12   argumentative with a customer?

13       A       I don't know that I was ever told that, but

14   I think that's common sense.

15       Q       How often did you access MyRT to look at

16   the requirements of your role, how you're supposed to

17   handle calls, timing requirements, service requirements?

18   How often did you look at it?

19       A       Generally, on a daily basis on every call

20   because they change -- they could change the procedures

21   at any time.

Terri Cowgill
08/21/2020

```
 1       Q       Okay.  And were you aware that when you

 2   were on your calls with customers, merchants, banks,

 3   other departments, that there was a quality control

 4   function in which the calls were recorded and/or

 5   reviewed?

 6       A       Yes.

 7       Q       What was your understanding of how the

 8   quality control or assurance process or function worked?

 9       A       Can you be like more specific?  If -- if

10   the system was down, generally, quality's set in a

11   separate department from us.  But at the end of me being

12   there, they also had a third party doing some of their

13   quality, as I understood it.  But the Quality department

14   was in a different location to us, and they would

15   monitor the call as we were on it.

16       Q       All right.  And if they saw or heard

17   something that was -- they thought not good service or

18   didn't follow First Data policy, what would they do?

19       A       Depending on how bad it was, they could

20   fail the call or they could just knock points off.

21       Q       Depending on what they perceive to be bad
```

Terri Cowgill
08/21/2020

1   service, would they or could they escalate that to your

2   manager?

3       A       Generally, the Quality went through to our

4   manager, anyways, for them to -- well, at the end, the

5   Quality -- we used to meet with Quality and discuss the

6   calls.  Then towards the end, that did then went through

7   our managers and we had to discuss it with our managers.

8   And they also did like at the computer system as they on

9   Quality would actually sit beside us and do what is

10  called a side-by-side.  And they'd have this little

11  quality score card where they would check off each thing

12  and like, did I do my call opening?  Did I introduce

13  myself?  Did I verify the account before I gave out any

14  information?  That was the little score card that was

15  requested in the request for production.

16      Q       All right.  And so you -- there -- there

17  were instructions and -- and, for lack of a better word,

18  a script.  There were things you were supposed to do on

19  every call --

20      A       That is correct.

21      Q       There was a -- a scripted or a Fise [sic]

1    -- First Data-approved opening, how you introduced

2    yourself on the call?

3         A     Well, not so much the opening but the fact

4    that you had to do the opening before you could like

5    give out information.  You had to bear -- they had a

6    order of how they wanted the call to -- the -- the

7    so-called flow.  That's what they call it, the call

8    flow.

9         Q     Okay.

10        A     But they didn't tell me, you know, that I

11   had to say this as my call opening.

12        Q     Okay.

13        A     I -- I mean, there was requirements.  I had

14   to say my name, of course, and then what department I

15   was with.

16        Q     If it -- if it didn't appear that somebody

17   was on the line, how many times were you supposed to say

18   hello or your name before terminating a call?

19        A     Three times, at the end.  Like I said,

20   their policies change.

21        Q     Okay.  So toward the -- the end of your

1    tenure with the company in 2015, they had a policy in

2    place that said you were to try to make connection or

3    say your name or hello or whatever at least three times?

4         A    Yes, sir.

5         Q    Before disconnecting the call?

6         A    Yes, sir.

7         Q    Because otherwise, if somebody's on or they

8    didn't hear you or whatever, you disconnect, they could

9    -- they could be upset that you disconnected when they

10   got to call back?

11        A    Correct.

12        Q    Again, we're -- we're -- that's -- that

13   policy is designed to try to improve customer service?

14        A    Right.

15        Q    Ms. Cowgill, I'm gonna hand you a document

16   which has been marked for purposes of this deposition

17   today as Exhibit 6.

18             (Cowgill Exhibit 6 was marked for

19   identification.)

20        A    Okay.  Uh-hmm.

21        Q    Please take a moment to look this over, and

1    let me know when you're finished 'cause I will have some

2    questions for you regarding Exhibit 6.

3          A      Okay.

4          Q      Have you finished reviewing Exhibit 6?

5          A      Yes, sir.

6          Q      Have you ever seen this document before?

7          A      Yes, I have.

8          Q      And can you identify this document?

9          A      It's the 90-day improvement action plan

10   that I was given on August the 4th of 2015.

11         Q      All right.  If you look to page 2 of

12   Exhibit 6, there's some signatures on there where it

13   says employee signature.  Is that your signature?

14         A      Yes, it is.

15         Q      That's your handwritten?

16         A      Yes, sir.

17         Q      You affixed your signature to this

18   document?

19         A      Correct.

20         Q      And you dated it August 4th, 2015?

21         A      Correct.

1      Q      And the signature below that or your

2   manager's signature, do you recognize that signature?

3      A      I do.

4      Q      Who is that?

5      A      Dawn Rowe.

6      Q      And who was Dawn Rowe?

7      A      A manager.

8      Q      Was she your manager or supervisor?

9      A      Yes, sir.

10      Q      And it appears she dated this the same day.

11      A      Correct.

12      Q      All right.  And this appears to be a -- a

13   form, an improvement action plan or an IAP.

14      A      Correct.

15      Q      Did you understand this to be a -- a -- a

16   form or a process that the company used from time to

17   time when it wanted to manager associate performance?

18      A      Yes.

19      Q      All right.  On this particular document,

20   Exhibit 6, page 1, it lists your title as senior contact

21   center rep.

```
 1        A      Correct.

 2        Q      Was that your title at the time?

 3        A      I would assume yes.

 4        Q      All right.  And it says you -- the

 5  department you worked in at the time was Chargeback

 6  Response Center?

 7        A      That is correct.

 8        Q      And that's -- is that the same department

 9  that we've been referring to at this deposition as

10  chargeback or disputes?

11        A      Yeah.  They gave out chargebacks.  They

12  gave out disputes.

13        Q      Okay.  At this time, was that the official

14  name of the department in August of '15, the Chargeback

15  Response Center?

16        A      I would assume so.

17        Q      All right.  And says you worked at the

18  Hagerstown location?

19        A      Correct.

20        Q      And that your manager was Dawn Rowe,

21  R-O-W-E?
```

1    had argued with a customer.  We sat down and listened to

2    the call.  I asked her if I had a target on my back.

3    She asked me why I thought that.  I told her I -- I did

4    not -- first of all, everybody at First Data says that

5    quality is subjective, meaning that not everybody

6    interprets it the same way.

7         Q    Yeah.  Let's -- you -- you can certainly

8    have an opportunity to tell, you know, your perspective

9    on this later.  I wanna know about the context of the

10   meeting, you know, what was told to you.  So, let's --

11   let's just take it -- this'll probably be easier.

12        A    Okay.

13        Q    I'll just do it step-by-step.

14        A    Okay.

15        Q    So did you meet with Ms. Rowe regarding

16   this document?

17        A    I did.

18        Q    Okay.  Where did that meeting take place?

19        A    In her office.

20        Q    Okay.  And was that meeting on August 4th,

21   2015?

```
 1        A      Correct.

 2        Q      Okay.  Where -- did you report to work that

 3   day?

 4        A      Yes.

 5        Q      Okay.  And did -- at some point, she called

 6   you off the calling floor?

 7        A      Yes.

 8        Q      Into her office?

 9        A      Yes, sir.

10        Q      Do you recall what time of the day it was?

11        A      I do not.

12        Q      All right.  Was it just you and Ms. Rowe in

13   her office?

14        A      Correct.

15        Q      No one else was present?

16        A      Correct.

17        Q      Was anyone on the phone, like a speaker

18   phone or --

19        A      You mean in the office?

20        Q      Yeah.  When she met with you, did she have

21   like somebody from HR or another manager --
```

Terri Cowgill
08/21/2020

97

1    recertification had been known that day.

2         Q      Okay.  Had you previously requested to have

3    your FLMA recertified?

4         A      No.

5         Q      Okay.  All right.  And after that, what did

6    she say next?

7         A      She had found this call and she wanted us

8    to listen to the call.

9         Q      Okay.  Had she presented you with this form

10   yet?  Did she --

11        A      No.  No.  We listened to the call first.

12        Q      All right.  And so is the call on her

13   computer?

14        A      Yes.

15        Q      All right.  So she said there's a call.

16   There's some issues with it I wanna go over with you.

17        A      Correct.

18        Q      Something to that effect?

19        A      Correct.

20        Q      All right.  And then she accessed her

21   computer and played the call?

```
 1        A      Correct.

 2        Q      All right.  And when she played the call,

 3   did you recognize it to be your voice?

 4        A      I did.

 5        Q      All right.  Did you remember the call?

 6        A      I do.

 7        Q      Okay.  And did she play the entirety of the

 8   call with you?

 9        A      That I would not know.

10        Q      Okay.  Did -- but she played some aspect of

11   the call?

12        A      Correct.

13        Q      What do you recall was reflected in that

14   reported call?

15        A      I -- the person that called was what First

16   Data considers an ISO, an independent salesperson.  She

17   was calling to request that I fax her documentation,

18   chargeback documentation.  She was very argumentative,

19   but she's always very argumentative.  She has a

20   reputation for that.  And I don't know what else you

21   want me to say to -- I mean, I told her straight up,
```

1        A        I told her how to get Day.  I said, how to

2    get Damona, and hung up the phone.

3        Q        Was the conversation still happening?

4        A        Between she and I?  I don't believe so.  I

5    know Dawn Rowe said it was, but I remember telling her

6    how to get Damona and I released the call.

7        Q        And the Mona is a woman?

8        A        Mona Lee, I don't -- she was the -- or did

9    work at First Niagara Bank.

10       Q        And you listened to the call with Ms. Rowe?

11       A        I did.

12       Q        Okay.  And after she had played the call

13   for you, who spoke first?

14       A        I don't recall.

15       Q        Okay.  Did -- what do you recall Ms. Rowe

16   said about the call?

17       A        That she was going to have to put me on an

18   IAP for that.

19       Q        Okay.  Did she tell you why?

20       A        Yes.  She stated that I had argued with

21   her.

1    Q       She said that you have used -- you've been

2    argumentative with the caller?

3    A       Correct.

4    Q       Did she also tell you that you had released

5    the call prematurely?

6    A       I don't remember her saying that.  I know

7    she said that I had been argumentative.

8    Q       Okay.  Did you -- how did you reply?

9    A       I told her that my feelings were that I

10   hadn't been argumentative, that I was being direct with

11   her.

12   Q       If -- would it be fair to say that, in

13   summary, your supervisor, listening to this call,

14   thought you had been argumentative and thought you had

15   terminated or disconnected the call prematurely and was

16   writing you off for that?

17   A       You're asking me, would it be fair to say

18   that?

19   Q       Was that what she told you?  I mean, had

20   she told you all those things?

21   A       She told me that I had argued with a caller

Terri Cowgill
08/21/2020

1    again.  I don't recall her saying about releasing the

2    call prematurely, but it's on this paper.

3         Q      It is on the paper.  It was --

4         A      Correct.

5         Q      It was one of the things she identified

6    that you had done improperly, which was releasing the

7    call prematurely, or on page 2, where she says at the

8    top here that you disconnected the call.

9         A      Correct.

10        Q      Okay.  And she told you that this -- did

11   she tell you that this did not comport with, you know,

12   the company's, you know, service expectations?

13        A      She did.

14        Q      Did she tell you that she thought it --

15   that it constituted call avoidance?

16        A      I don't recall whether she said that or

17   not.

18        Q      Okay.  The document reflects that though.

19   Doesn't it?

20        A      Correct.

21        Q      Okay.

1   review this on -- on August 4, 2015 though before you

2   signed it?

3       A       Correct.

4       Q       All right.  Did you understand the import

5   or the impact of this document?

6       A       Correct.  We actually -- she actually told

7   me the signature was not agreeing to it but

8   acknowledging it.

9       Q       Right.  As it states under statement of

10  understanding, I acknowledge that I discussed this

11  document with my manager.

12      A       Correct.

13      Q       And you did discuss this document with your

14  manager?

15      A       Correct.

16      Q       And that you have read and understood the

17  document and realized that, I have been placed -- I have

18  placed my position in jeopardy.  It's that second line

19  there.  Correct?

20      A       Correct.

21      Q       You understood that to be a potential

1    outcome of your job because of this action?

2         A       Correct.

3         Q       And then it states next, I realize the

4    course of action that will be taken if I am unable to

5    successfully meet these expectations.

6         A       Correct.

7         Q       And then you were given a copy of this

8    document?

9         A       Yes, I was.

10        Q       All right.  And you signed it?

11        A       Correct.

12        Q       And you understood that you had 90 days

13   under which you'd be evaluated and further instances of

14   call avoidance or prematurely releasing a call could

15   result in further discipline, including termination?

16        A       Correct.

17        Q       Did you challenge your receipt of this IAP

18   in any way?

19        A       I -- I attempted to, but she said -- I

20   don't remember her exact words.  Something -- wasn't up

21   for debate or --

1          Q      She said it wasn't up for debate with her?

2          A      Correct.

3          Q      Okay.  So you did -- in that meeting, did

4    you -- you disagree with her that you shouldn't have

5    received this?

6          A      I told her I disagreed.  I told her that I

7    thought I was being direct, that I was not being

8    argumentative.

9          Q      Okay.  And -- and she said, I'm not

10   changing my mind.  It's not up for debate?

11         A      Yeah.  I mean, I don't remember her exact

12   words, but yes.  So it was not up for debate.  It wasn't

13   disputable.

14         Q      Okay.  Did you attempt in any way to

15   escalate your disagreement with receiving this IAP to

16   her manager?

17         A      No.

18         Q      Did you attempt to escalate this IAP you

19   received or your displeasure at having received this IAP

20   to anyone in Human Resources?

21         A      No.

1       Q       Did you attempt to escalate your

2    displeasure with this IAP thorough any other dispute

3    resolution process that was in place at the company at

4    that time, whether compliance hotline, HR hotline, legal

5    department, anything like that?

6       A       No.

7       Q       And this document specifically advised you

8    that further disciplinary action could result for

9    further instances, including termination.  Correct?

10      A       Correct.

11      Q       In fact, it said it will be necessary or

12   the discipline will be necessary.  Correct?

13      A       I'm sorry.  Further discipline will be

14   necessary?  Were you reading that?

15      Q       Last -- last page of -- of the -- or I'm

16   sorry.  First page, last paragraph, where it starts out,

17   Terri --

18      A       Correct.

19      Q       Okay.  Did you go back to work that day?

20      A       Yes.

21      Q       Did you tell anybody about the fact that

Terri Cowgill
08/21/2020

1    you received it?

2         A     I don't know if it was that day or -- I

3    believe it was that day.  Not about the IAP.  Is that

4    what you're asking about?

5         Q     Yeah.  I mean, did you go out afterwards

6    and say --

7         A     No.

8         Q     -- you're not gonna believe this.  Dawn

9    Rowe just gave me --

10        A     No.

11        Q     -- an IAP?

12        A     Not that I recall.

13        Q     You just kept it to yourself?

14        A     Correct.

15        Q     All right.  And as we discussed, you didn't

16   escalate to anyone or attempt to challenge after any

17   company process?

18        A     Correct.

19        Q     I have a transcript of the statement that

20   you made to Unemployment regarding your unemployment

21   filing.  Here's how they said you summarized receipt of

Terri Cowgill
08/21/2020

111

1    that's something First Data discusses.  I mean, I

2    probably was familiar with it.

3        Q      Okay.  Whether the -- it was those exact

4    words?  You -- you understood the gist and general

5    meaning of what the company considered call avoidance?

6        A      Correct.

7        Q      Would you agree with me that if you engaged

8    in these behaviors that the company has listed as

9    constituting call avoidance, as listed in the bullets on

10   Exhibit 6, engaging in those behaviors could have

11   negative consequences with customers and -- and clients?

12       A      Do I agree that it could have negative

13   consequences with clients?  Yes.

14       Q      Okay.  So as of August 4, 2015, you agree

15   that you were on notice that any future acts of call

16   avoidance, including those listed on the bullets on page

17   1 of Exhibit 6, could result in your termination.

18   Correct?

19       A      Correct.

20       Q      All right.  In September of 2015 was

21   another call that you had reviewed with you?

1       A       Correct.

2       Q       And who brought that call to your

3    attention?

4       A       Dawn Rowe.

5       Q       Did Ms. Rowe tell you how that call came to

6    her attention?

7       A       I don't know that she did.  I can't answer

8    that.

9       Q       Okay.  Were you -- were you aware that the

10   caller on that particular call had filled out a survey

11   and had complained about what had happened on the call?

12      A       You mean after the call happened?

13      Q       Yes.

14      A       Yeah.  Yes.

15      Q       Okay.  And are you aware -- so you're aware

16   that that happened?

17      A       Oh, yes.

18      Q       And who told you that?

19      A       Dawn Rowe.

20      Q       And were you aware that that survey then

21   got directed to Ms. Rowe?  Did she tell you that?

```
 1         A       Well, I mean, I know she got a hold of it,

 2   but I don't know if it went to Quality and Quality gave

 3   it to her, what that process is.

 4         Q       Okay.

 5         A       Actually, I believe that it goes through

 6   Quality first.  And before I forget, I did bring you

 7   some additional documents today.  I left them in my car.

 8   I actually have a copy of the VOC, if that would help

 9   you.

10         Q       Of the -- the Voice of the Client?

11         A       Yes, sir.  I actually found it while I was

12   cleaning out a drawer.

13               MR. JELLINEK:  Okay.  Well, why can't we do

14   this?  Why don't we -- since we're -- as --

15         Q       And it relates to the subject I'm talking

16   about now?

17         A       The VOC.  It shows you what a VOC looks

18   like, how Quality scores it, and then how the merchant

19   scores it.

20               MR. JELLINEK:  Okay.  Well, why don't we do

21   this?  Why don't we go off the record and we'll let you
```

Terri Cowgill
08/21/2020

120

1    be a -- a -- a negative response to that call?  The --

2    the -- the caller was not happy?

3         A    Oh, yeah.

4         Q    Okay.  And Ms. Rowe shared with you that a

5    caller had completed a survey and wasn't happy?

6         A    Correct.

7         Q    Did she tell you what the caller had said

8    or what was communicated that the caller wasn't happy

9    about?

10        A    I -- something to the effect that I hung up

11   on him without giving service.

12        Q    Okay.  Did she review the call with you?

13        A    Correct.

14        Q    She played the call and you listened to it?

15        A    Correct.

16        Q    And what did that call or what did that

17   recording of the call reflect?

18        A    A man talking in the background to someone.

19        Q    Okay.  And did you ever engage in any

20   service with that customer or client?

21        A    Not that -- or not on the recording that

Terri Cowgill
08/21/2020

1   was played for me.

2          Q      Okay.  Could you hear your breathing or

3   your -- or your salutation to the customer?

4          A      No.  The only thing that could be heard was

5   a man talking to someone else in the background.

6          Q      That could be heard throughout the entirety

7   of the recording?

8          A      Correct.

9          Q      And then you hear the call become

10  disconnected?

11         A      Well, no.  At the end, right when I was

12  disconnecting, he said hello.  And -- but it was already

13  too late.

14         Q      But you could hear somebody talking in the

15  background?

16         A      Correct.

17         Q      And during the entirety, if you can hear

18  somebody talking in the background, you cannot hear

19  anything you're saying?

20         A      Correct.  On the recording, you're asking

21  me?

1          Q      Yes.

2          A      Correct.

3          Q      On the recording that Ms. Rowe played or

4    Ms. Rowe played for you, you cannot hear you saying

5    hello or hello, this is Terri Cowgill, or, how may I

6    help you?  There's no salutation that you could hear you

7    saying?

8          A      Correct.

9          Q      Okay.  And so, Ms. Rowe's position was that

10   you had not engaged with this client and terminated the

11   call prematurely?

12         A      Correct.

13         Q      Okay.  She shared that with you?  She told

14   you that?

15         A      Correct.

16         Q      And did she tell that that was a further

17   instance of call avoidance or prematurely hanging up a

18   call and was gonna result in your termination?

19         A      Correct.

20         Q      Okay.  Did you dispute that with her?

21         A      What?  The actual call?

1     Q     Yes.

2     A     No.  She -- the first thing she said to me

3  was that I was terminated, so I didn't think that was

4  disputable.

5     Q     Okay.  And she told you it's because you

6  hadn't engaged with the customer and that you had

7  terminated prematurely before engaging with them on the

8  call?

9     A     I believe she said that it was for

10  prematurely releasing the call.

11     Q     Okay.  And she played the recording for

12  you?

13     A     Correct.

14     Q     And at no point could you hear your voice

15  on the call?

16     A     Correct.

17     Q     And she couldn't hear your voice on the

18  call?

19     A     I don't know what she could hear.

20     Q     All right.  Well, you didn't hear it?

21     A     Correct.

```
 1        Q       Okay.  And then, ultimately, the call got

 2   disconnected or clicked off as the gentleman said hello?

 3        A       Correct.

 4        Q       Okay.  And how long did that meeting last

 5   with Ms. Rowe?

 6        A       Well, actually -- the whole meeting to

 7   terminate me?

 8        Q       Yes.

 9        A       I don't know.  I mean, I got like a half an

10   hour overtime out of it.  But the actual recording when

11   she played it for me was only like 26 seconds.  And then

12   I think she told DLL or -- or the EEOC one that it was

13   actually 29 or 30 seconds.  But yeah.  I mean, it didn't

14   last long.  She told me I was terminated and asked me if

15   I wanted to cash in any of the points, if I needed

16   anything out of my desk, walked me out -- or walked me

17   out to the back of the building.

18        Q       Okay.  Did you object or dispute any of

19   what she was saying --

20        A       No.

21        Q       --  in that meeting?
```

Terri Cowgill
08/21/2020

125

1        A       No.

2        Q       Okay.  What I previously --

3        A       What --

4        Q       What I previously asked you about then, a

5   -- the August 4, 2015 meeting and you're not escalating

6   that, and you said you had not.  You hadn't complained

7   to anyone in HR or her -- Dawn Rowe's manager or anyone

8   else in the company.  Why -- why didn't you?  Why did --

9   if you thought it was not correct or that you hadn't

10  been argumentative and hadn't prematurely hung up the

11  call, why didn't you --

12       A       During --

13       Q       -- bring that or adjust it or try to

14  escalate it?

15       A       During the August 4th?

16       Q       Yeah.

17       A       Well --

18       Q       On that first one.  Yeah.

19       A       Well, because the next step would've been

20  HR, and, obviously, in February, they were tiddling

21  [sic] to help.

Terri Cowgill
08/21/2020

1    that discipline.  Correct?

2        A     According to Annette Wood, it was based on

3    the fact that Dawn Rowe -- that because I was such a

4    good rep, Dawn Rowe had vouched for me.  It wasn't

5    released -- it wasn't taken back because it was done in

6    error for FMLA or anything like that.  She sit there and

7    she either called Dawn or she pretended to call Dawn and

8    come back and said that because I was such a good rep,

9    she was gonna have it erased was her word.

10       Q     Okay.  Getting back to my other question

11   then, you're saying because of the manner in which HR

12   engaged with you regarding your issues in February, you

13   thought that there was no point in challenging that

14   discipline or IAP you received in August 4, 2015.

15   Correct?

16       A     Correct.

17       Q     Okay.  How about your termination of

18   September 15, 2015?  Did you escalate that Ms. Rowe's

19   manager?

20       A     No.

21       Q     Did you escalate that to HR?

```
 1        A       No.

 2        Q       Did you call the company's ethics or

 3   compliance line?

 4        A       No.

 5        Q       Did you call anyone in the legal

 6   department?

 7        A       No.

 8        Q       Did you call anyone in senior leadership in

 9   HR?

10        A       No.

11        Q       Do you disagree with the termination

12   decision?

13        A       I -- I disagree with the reason why they

14   said I was terminated.  I think they were -- there were

15   -- they're being less than honest about it.

16        Q       In what way?

17        A       Well, first of all, by saying that I was

18   rude and unprofessional on the first call was -- I made

19   a direct statement.  If you refer to the evaluations

20   that you sent me, that was actually listed as my

21   strength that I was able to become very direct if need
```

1    they're trying to get me out of here.  She said, why?

2    And I said, I guess they're still pissed about the FMLA.

3        Q    Okay.  It's -- it's your belief that the

4    company separated you because you took FMLA leave?

5        A    It is my belief.  That and because on the

6    next paperwork that the doctor filled out, he said it

7    was a possibility that I may have to go on a reduced

8    schedule again.

9        Q    Okay.  In any event, you didn't challenge

10   your termination through any company process or anybody

11   at senior management or HR after you were terminated?

12       A    I think that would've been a gross waste of

13   my time.

14       Q    Okay.  And to -- just to be clear, your

15   voice couldn't be heard at any time on that call that

16   Ms. Rowe reviewed with you in September.  Correct?

17       A    Correct.

18       Q    And you did not have your call on mute?

19       A    No.  She tried to actually get me to say it

20   was a phone issue when they were disputing it through

21   DLLR.  If you read that, that I told -- excuse me.  Is

Terri Cowgill
08/21/2020

1    starting to get a tickle in my throat.  I told her I

2    didn't believe it was a phone issue because that call

3    was done, I believe, at 12:00 or 1:00 in the afternoon,

4    so I took calls all morning and I took calls all

5    evening.  Never had any issues.  I only had issues on

6    that call, and then when that call happened, she said,

7    well, was it a phone issue?  And I said, I don't think

8    so.  I mean, otherwise, I would think that I would have

9    the issue all day.

10          Q     Okay.  Fair enough.

11          A     And I would've said that it was a phone

12   issue and I didn't report the phone issue, then that's

13   terms for termination.

14          Q     And so up until that time all day long, you

15   were -- you had taken calls and everybody had been able

16   to hear you just fine?

17          A     Correct.

18          Q     So in your mind, there wasn't a phone

19   issue?

20          A     I don't believe it was a phone issue at

21   all.

1       Q       Okay.  Going back to Exhibit 1, which we

2   marked it earlier on in your deposition, which is your

3   complaint.

4       A       Okay.

5       Q       And specifically, you'd go to -- at the

6   top.  It would be page 7 of 15.

7       A       Okay.

8       Q       And I'm referring specifically to count one

9   of your lawsuit, or claim one, I guess is another way to

10  put it.  You're claiming a violation of the Americans

11  with Disabilities Act?  Is that right?

12      A       Correct.

13      Q       And the specific allegation, as reflected

14  in paragraph 29 of your complaint, is that First Data

15  Technologies, Inc. violated the ADA when it terminated

16  you because it regarded you as having a disability.

17  What -- what is the disability that you had or have?

18      A       Sitting for prolonged periods of times.

19  The actual disability would be back issues, I guess.

20      Q       You have back issues?

21      A       Correct.

1    may have to go on some sort of a intermittent leave,

2    FMLA again.

3         A    Or a reduced schedule.  Correct.

4         Q    Okay.  Anything else that you believe is a

5    fact or piece of evidence that supports your contention

6    that your disability was a motivating factor in the

7    decision to terminate your employment?

8         A    Well, the fact that they never reduced my

9    schedule to begin with, but it's my belief that they did

10   that because they required the mandatory overtime.

11        Q    Okay.  Anything else?

12        A    Not that I can think of at this time.

13        Q    All right.  In count two of your lawsuit,

14   which is Exhibit 1, page 9 of 15 --

15        A    Okay.

16        Q    -- you have a second claim under the

17   Americans with Disabilities Act in which you claim that

18   the company refused to make a reasonable accommodation

19   to a known physical disability that you have.

20        A    Correct.

21        Q    Okay.  What is the reasonable accommodation

```
1    that you requested that you contend the company refused

2    to grant?

3          A     My doctor requested that I be put on a

4    reduced schedule -- four hours per day, three to five

5    days per week -- while I was going through physical

6    therapy.

7          Q     Reduced schedule?  Four hours per day?

8          A     Yes, sir.  Three to five days per week.

9          Q     And which doctor made that recommendation?

10         A     Dr. Patlinghug.

11         Q     I'm sorry.  Spell that, please.

12         A     I'll try.  It's P-A-T-L-I-N-G H-U-G, I

13   believe.  Patlinghug.  I gotta say it fast.

14         Q     Okay.  And in what manner did he

15   communicate that -- that need for reduced hours and

16   reduced days?

17         A     He filled out the FMLA paperwork.

18         Q     And you -- this accommodation that you're

19   talking about as far as reduced schedule, you made that

20   request for an accommodation via FMLA request.  Correct?

21         A     Yes, sir.
```

1      Q      And when did you make this request for a

2   reduced schedule?

3      A      I don't have the paperwork in front of me.

4   I believe the doctor signed it on January the 20th of

5   2015, but I don't have that here in front of me for the

6   exact date.  It might've been June.  So --

7      Q      Was that request for intermittent leave

8   approved by the company?

9      A      Yes, sir.

10     Q      Did you take reduced hours and reduced days

11  off?

12     A      No.

13     Q      Why not?

14     A      Well, let me correct that.  I took reduced

15  hours off for my physical therapy, but First Data never

16  reduced my actual schedule to four hours per day three

17  to five days per week.

18     Q      But you, in fact, didn't -- you, in fact,

19  didn't come in when you needed to take off for physical

20  therapy?

21     A      Most of my -- well, normally, the way they

Terri Cowgill
08/21/2020

```
 1   set up my -- I would be at work, and then my physical

 2   therapy would happen in the afternoon or in the evening.

 3        Q     And you -- you received a letter from the

 4   company -- did you not? -- in which First Data approved

 5   your initial FMLA request?

 6        A     Yes, sir.

 7        Q     And given this approval, can you tell me

 8   how or why you believe that First Data failed to

 9   accommodate this request for a reduced schedule?

10        A     Because every day, I went in and checked my

11   schedule and it wasn't reduced.

12        Q     Did you share that with anyone that you

13   were still on the schedule?

14        A     Dawn Rowe multiple times.

15        Q     And what did she say when you shared that

16   with her?

17        A     I told her -- I don't know what time it was

18   I said it to her, but she told me while my physical

19   therapy was goin' on to just go ahead and whenever I had

20   to leave for physical therapy, to call Workforce

21   Management and they would -- in that new pack that I
```

Terri Cowgill
08/21/2020

1  brought you today, you'll see what their schedule looks

2  like.  They would go in and schedule my physical

3  therapy.  So she told me I was to call them when I left

4  for physical therapy and then call 'em when I got back

5  from physical therapy.

6      Q      Okay.  And was there some other manner in

7  which you think that the company should've accommodated

8  you?  I mean, if -- whether or not you were on the

9  schedule, if she said, if you can't come in 'cause you

10  have therapy or you're hurting, don't come in, what's --

11  what's the difference whether you're scheduled or not?

12      A      Because we have schedule compliance.

13  That's part of what we're -- if you look at the reviews,

14  that's what we're based on.  So unless it's put in my

15  schedule, that actually counts against me.  I think it

16  was seven minutes per day we were allowed to go outside

17  of what are actually scheduled -- of what our actual

18  schedules said.

19      Q      Well, did anyone ever tell you that they

20  were counting your time away at physical therapy or when

21  you said you were hurting and couldn't come in against

1    I told her it was scheduled.  I said, I've already

2    scheduled it.  If you go ahead and get my schedule

3    reduced, I'll try to make it because if you look at the

4    IAPs, we're supposed to -- or I'm sorry.  If you look at

5    the approvals of the late management, time off and

6    stuff, we're supposed to schedule doctor's appointments

7    and stuff outside of our normal work hours.  Well, if

8    they didn't give me normal work hours, then, you know,

9    reduce it to four hours.  There was no way I could

10   schedule it so that it didn't interfere with work.  Does

11   that make sense?

12        Q     I -- I understand what you're testifying

13   to.

14        A     Okay.  Well, what I'm trying to say to you.

15   Because they did not say, okay.  You have Monday,

16   Wednesday, and Fridays off.  That's your three days per

17   week.  Then I could've scheduled my going to my doctor

18   and said, okay.  I need my physical therapy for Monday,

19   Wednesday, and Friday.  They never did that.

20        Q     But to be clear, they said if you needed to

21   go at physical therapy, you should just go.  Call

Terri Cowgill
08/21/2020

151

1    Workforce Management and go.

2         A     Dawn told me whenever I left for physical

3    therapy to call Workforsh [sic] -- Workforce Management

4    and they would take care of my schedule.  Correct.

5         Q     All right.  So whether you were on the

6    schedule or not, nobody said you couldn't have that

7    time?

8         A     Not for physical therapy.  Correct.

9         Q     Okay.  Well, was there any other time that

10   you needed to have off for that they didn't give you

11   time off for?

12        A     Yeah.  He wanted me reduced to four hours

13   per day so I wasn't sittin' for eight to ten hours.  He

14   said -- or he believed that would help my back to heal.

15        Q     Okay.

16              THE WITNESS:  While I'm thinkin' about it,

17   do I get a copy of this deposition also, or can I

18   request a copy of it?

19              MR. JELLINEK:  You can.

20              THE WITNESS:  Okay.

21        Q     Ms. Cowgill, I'm gonna hand you a document

1    which is now marked for the purposes of this deposition

2    as Exhibit 8.

3              (Cowgill Exhibit 8 was marked for

4    identification.)

5         A     Okay.

6         Q     Please take a look at that and let me know

7    when you're done as I'll have some questions for you

8    regarding Exhibit 8.

9         A     Okay.  I'm ready.

10        Q     Have you seen this document before?

11        A     Yes, sir.

12        Q     Okay.  And can you tell me what this

13   document is?

14        A     It is Leave Management's response to my

15   request for FMLA.

16        Q     Okay.  And you acknowledge receiving that

17   document?

18        A     Yes, sir.

19        Q     This was sent to you after you requested

20   reduced basis or intermittent leave.  You received this

21   letter dated January 26, 2015 from First Data Leave

Terri Cowgill
08/21/2020

153

1    Management team?

2          A      Correct.

3          Q      And it advised you that your request for

4    intermittent leave of absence meets the criteria and

5    qualifies for FMLA leave.  Correct?

6          A      Correct.

7          Q      And that you had been approved for the

8    period that you requested?

9          A      Correct.

10         Q      And it says, your health care providers

11   indicate that you may need time off to care for yourself

12   within the following parameters: four hours per day,

13   three to five days per week.  Correct?

14         A      Correct.

15         Q      And then it's -- so basically telling

16   you've been approved for what had been requested.

17   Correct?

18         A      Correct.

19         Q      And then it told you what -- what you need

20   to do when you're on one of these intermittent reduced

21   basis leaves?

```
 1         A      Correct.

 2         Q      Attempt to schedule doctors during nonwork

 3    hours?

 4         A      Right.

 5         Q      Notify if there's any changes.  You'll need

 6    to be recertified after this period ends.

 7         A      Correct.

 8         Q      Contact Leave Management if you exceed the

 9    approved frequency above.  Following your business

10    unit's call-in procedures.  And doesn't make your

11    absences as FMLA when calling in.  Correct?

12         A      Correct.

13         Q      So the company's -- and the Leave

14    Management team, what is that?

15         A      It's just the department as far as I know

16    during -- that handles first-status employees' request

17    for leave of absence or FMLA or I don't know for what --

18    like they're a branch off of HR.  Well, I guess 'cause

19    it says First Data HR Service Center.

20         Q      Okay.  So after you'd been approved for

21    this leave, was there ever any day where you had worked
```

1    four hours per day on the schedule and you said, I -- I

2    can't work anymore so I'm gonna go tell Dawn Rowe I've

3    had enough.  I'm gonna just -- I'm not -- I -- I gotta

4    go.  Pursuant to my FMLA intermittent leave, I'm telling

5    Workforce Management I gotta go today and I'm -- I'm not

6    working?

7         A     Not four hours.  I did leave one day.  I

8    just stood up and put on my coat.  She was across the

9    room and she come walking towards me and asked me if I

10   was okay.  And I said, no.  I'm going home.

11        Q     And what did she say?

12        A     Nothin'.

13        Q     Did you call in to Workforce Management,

14   said, I'm taking this time off for FMLA?

15        A     Yeah.  I woulda had to do that and call her

16   extension before I even left, so I'd done that before I

17   even stood and put on my coat.

18        Q     On any day where you were on the schedule,

19   did you ever -- and you felt like it's just too

20   uncomfortable to work today, you know, I -- I really --

21   I -- I just can't come in, did you ever call Dawn and

1    say, I can't come in.  I'm taking this as my -- under my

2    approved intermittent leave?

3         A     Well, February the 11th.  That's the day I

4    got the occurrence for attendance.

5         Q     Right.  Okay.  So they -- again, you got

6    written up for that.  Somebody -- somebody, whoever was

7    processing that, didn't realize that that was still

8    covered time for you for FMLA.  Correct?

9         A     That's what they said.

10        Q     Okay.  Ms. Cowgill, I'm now going to hand

11   you what's been marked for purposes of this deposition

12   as Exhibit 9.

13              (Cowgill Exhibit 9 was marked for

14   identification.)

15        A     Thank you.

16        Q     Please take a moment to look this document

17   over and let me know when you're finished because I'll

18   have some questions for you regarding Exhibit 9.

19        A     Okay.

20        Q     All right.  Can you identify that document?

21        A     Yes.

Terri Cowgill
08/21/2020

```
 1        Q      What is it?

 2        A      This is the FMLA paperwork filled up by my

 3   doctor.

 4        Q      All right.  And this is where he states

 5   that you may need to work four hours a day, three to

 6   five days a week?

 7        A      It says employee need.  I don't know.

 8   Doesn't say mean -- may need to.  He tell me I did.

 9        Q      Well, the top -- the whole top preparatory

10   says, well, if you're -- as you may need -- I mean, you

11   can read the whole thing.  I'm not gonna read it for

12   you.  But the gist of this is, at your -- at your level,

13   when you -- when you feel like you can't come in, you

14   should be allowed to work that schedule.  Correct?

15        A      I should be allowed to work four hours per

16   day, three to five days per week.  Correct.

17        Q      Okay.  And, again, at any -- at -- and that

18   was to -- at your comfort level or when you felt like

19   you could, or did you feel like your schedule should

20   just be changed?

21        A      No.  I believe he felt like my schedule
```

```
 1   should just be changed because he said he felt that it

 2   would allow my back the time to heal.

 3        Q     Okay.  And --

 4        A     I don't believe it was ever at my

 5   discretion.

 6        Q     Okay.  Again, notwithstanding the fact that

 7   your schedule had not been changed, if you needed to go

 8   to physical therapy or if you were hurting and had to

 9   go, the company -- the company was fine and approved you

10   to take that leave.  Correct?

11        A     I can't say that they were fine.  I just

12   called Workforce Management, told them I was leavin',

13   and I got designated as FMLA so it didn't hurt my

14   schedule compliance.

15        Q     Okay.  And your initial period of -- of

16   FMLA leave, intermittent reduced-basis leave was

17   approved through February 20th, 2015.  Correct?

18        A     Correct.

19        Q     And that that period was approved in

20   accordance with your physician's recommendation?

21        A     Correct.
```

Terri Cowgill
08/21/2020

159

1      Q      Do you contend that you should've been

2   allowed to work for the same reduced hours after

3   February 20th, 2015?

4      A      That I should've been?

5      Q      Yeah.  'Cause that's what we were talking

6   about, your claim that the company failed to accommodate

7   you --

8      A      Correct.

9      Q      -- on count two of your lawsuit.  And you

10  have told me that you thought that they didn't really

11  honor what your request was or when your physician said

12  you should've had off for with respect to that initial

13  FMLA request that went through February 20th, 2015.  Are

14  you saying that there's any other way or any other

15  manner or fashion in which the company failed to give

16  you accommodation that you asked for?

17     A      Not as I can think of at this time.  That

18  was the schedule.

19     Q      So it's just that schedule for --

20     A      Correct.

21     Q      -- the initial period in -- in January --

1    -- one to two days per month.  He said I would -- could

2    have flare-ups and I should be covered for one to two

3    days per month.  It might be on this because they had it

4    updated.  I -- but -- yeah.  That's the one I told you

5    that I had updated after I missed February the 11th

6    because they said I wasn't authorized to miss full days.

7    So I had to get back to the doctor and have him refill

8    it out because it only mentioned the part-time schedule

9    and they wanted it to mention the full days also.  Yes.

10   So there is another copy of this.  It was the same form

11   but he just revised it and initialed it and --

12        Q     All right.  And so after he sent a -- after

13   he, being your physician, sent in another

14   recertification for your continuing need for

15   intermittent or reduced-basis leave, the company

16   approved that request.  Correct?

17        A     Correct.

18        Q     I'm going to hand you what's been marked

19   for purposes of this deposition as Exhibit 10.

20              (Cowgill Exhibit 10 was marked for

21   identification).

1      Q      Please take a moment to look this document

2  over, Ms. Cowgill.  Let me know when --

3      A      Thank you.

4      Q      -- you're done and I'll have some questions

5  for you regarding this document.

6      A      Okay.  I have it here.

7      Q      All right.  And do you know what that

8  document is?

9      A      Yes, I do.

10     Q      And what is it?

11     A      It's the FMLA recertification we were just

12  discussing.

13     Q      All right.  And did you receive a copy of

14  this document?

15     A      I did.

16     Q      Do you recall when you received it?

17     A      No.  It was mailed the 20th, so, I would

18  assume a couple days after that.

19     Q      But mailed the 20th of what?

20     A      August.

21     Q      Okay.  And your physician had recommended

Terri Cowgill
08/21/2020

```
1    that you may need time off one to two days a month?

2         A       Correct.

3         Q       All right.  Did you ever ask or need to

4    take two days off a month after that?

5         A       I don't remember.

6         Q       Okay.  Is there -- you know, after the

7    initial period from January 26 to February 20, where you

8    were approved for intermittent leave, is there ever any

9    other accommodation request that you made of the company

10   for your back condition that the company did not grant?

11        A       No.  Other than the reduced schedule and

12   then the one to two days per month.

13        Q       All right.  And you -- did you ever tell

14   Ms. Rowe, hey, this is one of those days where I'm

15   flaring up.  I need to take off today?

16        A       I don't recall.

17        Q       Okay.

18        A       I -- I mean, I can't remember at this time.

19   I would --

20        Q       And your physician's note -- was you may

21   need to take one to two days off a month.  It wasn't
```

Terri Cowgill
08/21/2020

1   required that you be scheduled off one to two days a

2   month.  Correct?

3          A       I believe it said that I could experience

4   flare-ups.

5          Q       And so the company had approved you for

6   that.  When you have a flare-up, let us know and it's

7   approved for intermittent leave?

8          A       Correct.

9          Q       Do you recall ever -- any instance after

10  that had been approved where you actually had to say,

11  I'm having a flare-up today.  I can't come in?

12         A       I can't recall.

13         Q       Okay.  So, as you sit here today under oath

14  of this deposition, you can't recall any other time

15  after you'd been approved for that leave in August 20 of

16  2015 where you requested a time off and nobody didn't

17  give you the time off?

18         A       Correct.  Because that would -- be what?

19  Like a month before I was terminated.

20         Q       Right.  You were terminated on September --

21         A       September --

1        Q        -- 15 --

2        A        Yeah.

3        Q        -- 2015?

4        A        Yeah.

5        Q        Okay.  But the company, the Leave

6    Management team told you were approved for that if you

7    needed it?

8        A        Correct.

9        Q        You just -- as you sit here today, you

10   can't recall whether you actually ever needed -- ever

11   needed to take a day off?

12       A        Correct.  I don't.

13       Q        And is it fair to say then that you can't

14   remember any instance where the company ever denied you

15   a day off pursuant to your approved FMLA intermittent

16   leave?

17       A        The one to two days per month?  Correct.  I

18   didn't say that.

19       Q        And other than periodic time off from work

20   under the FMLA, was there ever any other accommodation

21   requests you made of the company?

Terri Cowgill
08/21/2020

```
 1        A      Not that I recall.

 2        Q      Do you recall what your rate of

 3   compensation was at the time of your separation from

 4   First Data?

 5        A      I believe that it was 15.50 per hour.

 6        Q      And how many hours did you normally work

 7   per week?

 8        A      At least 40, but then we have the mandatory

 9   overtime in there.  And like I said, they had undertime,

10   but the undertime kinda disappeared when the mandatory

11   overtime come into play.

12        Q      And how often do you recall actually being

13   scheduled for mandatory overtime?

14        A      I think it was -- I think we were told it

15   could be up to four hours per week.  Can't remember the

16   amount, but it was -- from what I recall, it was

17   anywhere from two to four hours per week.

18        Q      And you were paid overtime at a rate of

19   time and a half?

20        A      Correct.

21        Q      So the 23, 25?
```

190

1    Disabilities Act?

2         A      Back pain where I can't sit for long

3    periods of time. I can't lay. I get up and walk the

4    floor in the middle of the nights. I just paced out

5    there while we had our break because I was tired of

6    sitting. I do have neck pain. And I do have headaches,

7    but headaches though, I pretty much had them with

8    sinuses and other things too.

9         Q      And the back pain and neck pain, what do

10   you -- what do you attribute that to? Has anybody

11   diagnosed you as -- as actually possessing any physical

12   condition or diagnoses of a impairment that you have?

13        A      Not that I recall. Dr. Patalinghug, I

14   believe, at one point did blood work to see if there was

15   something, you know, like low blood levels or something.

16        Q      But you -- you don't know what medical

17   condition or diagnosis or impairment you have other than

18   how it manifests itself, that you just have pain?

19        A      Correct.

20        Q      And can't sit?

21        A      Correct.

Terri Cowgill
08/21/2020

1        Q      But you don't know what that's due to?

2        A      Well, I know it originally started with the

3    car accident. I never had it before the car accident.

4    Now, I just have it and, you know.

5        Q      But no one -- you've not done an MRI to say

6    it's a -- it's a herniated disc or a bulging disc or --

7        A      Oh.

8        Q      -- impingement or --

9        A      I think Waynesboro Emergency Room and I

10   think Dr. Patalinghug both did MRIs.

11       Q      Okay. And did -- what do you -- what do you

12   recall that they showed?

13       A      I don't know that I -- I think Dr.

14   Patalinghug said that he could see some muscle damage

15   tissue and -- or tissues and ligaments and stuff. But I

16   don't recall the whole conversation.

17       Q      And you don't recall seeing any medical

18   records which said this is now a permanent physical

19   impairment that you have?

20       A      No. I don't have those medical records if

21   they exist.

1        Q       Did any physician ever tell you that you

2    had a permanent physical impairment?

3        A       No.

4        Q       What did Dr. Patalinghug -- why did he tell

5    you he thought you would need pain management?

6        A       Because I completed physical therapy and I

7    was still having neck and back pain. It was mostly in my

8    back.

9        Q       Did Dr. Patalinghug ever tell you he

10   thought that that pain would be permanent?

11       A       I don't recall him saying that exact words,

12   but -- yeah. I don't recall him saying that.

13       Q       And he told you he thought that he saw some

14   muscle -- some --

15       A       I believe it was muscle and tissue and

16   ligaments.

17       Q       Okay.

18       A       From the -- he did a -- if I recall

19   correctly, when the ambulance took me to Waynesboro

20   Hospital, I can't remember if they just did an X-ray or

21   if they did an X-ray or an MRI and then when I went to

Terri Cowgill
08/21/2020

1    wanted to get into it, but --

2          Q       Mr. Lewis, we've already talked about him.

3    He was your manager before Dawn Rowe?

4          A       Correct.

5          Q       And you claimed he would be able to have

6    said that you were qualified?

7          A       Yes. All of the reviews that First Data

8    sent me shows that he said I was more than qualified, I

9    was knowledgeable.

10         Q       Have you ever heard Dawn Rowe making any

11   statements which you believe reflect a bias on her part

12   against people with disabilities?

13         A       Not that I recall. Not personally.

14         Q       Have you ever seen anything that Ms. Rowe

15   wrote which you believe reflects a bias on her part

16   against people with disabilities?

17         A       No, but I wouldn't have access to that

18   information.

19                 (THE REPORTER asks the witness to repeat

20   answer).

21         A       I said no, but I would not have access to

Terri Cowgill
08/21/2020

1   was treated more favorably than you for similar conduct?

2        A     I don't have access to who is on

3   improvement action plans and whofs not.

4        Q     Do you believe you possess any physical

5   condition that prevents you from working?

6        A     Today? No. No, I get up and go to work

7   every day. It doesn't mean I don't have aches and pains,

8   but --

9        Q     The pain that you said you experience in

10  your back and your neck, does it prevent you from doing

11  any -- any normal daily activities?

12       A     Sometimes.

13       Q     Such as?

14       A     Like I told you that one day my back does

15  tend to lock up. So just sitting for long periods of

16  times or riding in a car for long periods of times or

17  bending over in my shower scrubbing it. I have to take

18  breaks. I mean, I can still work, but --

19       Q     Have you been experiencing any discomfort

20  today as you've sat here through today's deposition?

21       A     I mean, it's uncomfortable. I keep

1    switching up to sit straight up and just when we had our

2    break, I was out there walking.

3         Q     Who at First Data do you believe

4    discriminated against you?

5         A     I think Dawn Rowe and then I think she had

6    help from Annette Wood and she definitely had help from

7    Shelly Williams.

8         Q     Have you ever heard Annette Wood make any

9    statements that you believe reflect a bias on her part

10   against disabled people?

11        A     I didn't work with Annette Wood. I believe

12   the first time I went into her office, I knew who she

13   was because pretty much know who people are there, but

14   I'd never spoke with her before, so I wasn't around her

15   to hear her say anything.

16        Q     So the answer to my question would be no?

17        A     Correct.

18        Q     Have you ever seen anything that she's

19   authored or written or otherwise expressed in writing,

20   e-mail or anything like that that you believe reflects a

21   bias on her part against disabled employees or you

Terri Cowgill
08/21/2020

220

1   because you were disabled?

2        A     No. The only thing I know of is her

3   interaction with Amanda Parmer.

4        Q     And you only know that because Ms. Parmer

5   told you?

6        A     Correct.

7        Q     And you don't have any personal information

8   --

9        A     No.

10        Q     -- or knowledge --

11        A     No.

12        Q     -- of those circumstances?

13        A     Correct.

14        Q     And you said the other person was Shelly

15   who?

16        A     Williams.

17        Q     Who is Shelly Williams?

18        A     She was the -- I got to think of her title

19   -- human resources manager of employee relations, I

20   think was her label.

21        Q     Have you ever heard Ms. Williams make any

Terri Cowgill
08/21/2020

221

1    comments that you believe reflects a bias on her part

2    against disabled employees or you specifically because

3    you're disabled?

4         A      Well, me specifically, if you read the EEOC

5    file in the e-mail she apparently wanted to send me a

6    message.

7         Q      Send you a message?

8         A      Yeah. If you read the e-mail, it's called

9    request for termination. Dawn Rowe tells her that I

10   ranked a three on a three-point scale, and Shelly had

11   pulled my previous two years, I believe, and said that I

12   was a three and then they switch from e-mail

13   conversation and go to phone conversation and then

14   Shelly comes back and says that she approves my

15   termination and something like hopefully this sends me

16   the message. I forget how it's worded, but it was

17   information submitted to you. It's in the EEOC file.

18        Q      Okay. But how does that reflect a bias on

19   her part against -- against you or anybody because

20   they're disabled?

21        A      Because she don't even know me. The only

1    thing she knows is what Dawn Rowe told her on the phone.

2         Q    And you don't know what that is?

3         A    Yeah. I don't know what Dawn Rowe told her

4    on the phone. I suspected what Dawn Rowe told her on the

5    phone.

6         Q    But you don't know?

7         A    Correct.

8         Q    You don't even know whether Shelly Williams

9    knew you were disabled or whether you've ever even taken

10   leave?

11        A    Correct.

12        Q    Do you even -- other than -- well, who do

13   you believe made the decision to terminate your

14   employment?

15        A    Honestly, I don't know.

16        Q    And you've previously told me that you've

17   never heard Dawn Rowe make any comments or statements

18   that you believe reflects a bias on her part against

19   disabled people. Correct?

20        A    Not that I recall. Correct.

21        Q    Nor seen anything in writing --

```
 1        A      No.

 2        Q      -- that reflects that?

 3        A      I wouldn't have access to Dawn's

 4    information.

 5        Q      Is there anyone else at First Data that you

 6    believe was treating you differently because you were

 7    disabled?

 8        A      I don't know that. I don't know how high up

 9    the chain this goes.

10        Q      Besides the three we've already talked

11    about, Dawn, Annette, and Shelly, has anyone else at

12    First Data ever said or done anything that makes you

13    think that you were terminated because of disability?

14        A      I don't know how to answer that. I've often

15    thought that knowing First Data, that they -- whenever

16    they were doing the downsizing like different portions

17    when at different times, that the FMLA people possibly

18    went first because --

19        Q      That's something you thought?

20        A      Correct. And --

21        Q      No one ever told you that happened?
```

Terri Cowgill
08/21/2020

225

1    with them.

2          Q      Have you ever seen anything in writing that

3    would make you think that First Data terminated you

4    because of your disability or based on disability?

5          A      No. And they wouldn't give me that in

6    writing.

7                 MR. JELLINEK: Yeah. I think I'm getting

8    ready to be close to done. Why don't we take a

9    ten-minute break and I'll review my notes and then we'll

10   wrap up?

11                THE WITNESS: Okay.

12                THE VIDEOGRAPHER: We're going off the

13   record at 2:17 p.m.

14                (Whereupon, a short recess was taken.)

15                THE VIDEOGRAPHER: We're right back on the

16   record at 2:34 p.m.

17         Q      All right.  Ms. Cowgill, a couple

18   additional questions. You had sent me some additional

19   documents earlier this week, some articles it looks like

20   you'd pulled off the internet.  Some concern the company

21   and some concern other litigation that they're involved

```
 1        A      Yes, sir.

 2        Q      Have you re -- your current employer,

 3   what's its name again?

 4        A      Hadley Farms.

 5        Q      Hadley Farms.  Have you requested an

 6   accommodation on Hadley Farms?

 7        A      No.

 8        Q      Why not?

 9        A      What do you mean an accommodation?

10        Q       Do you find any -- for your back

11   condition, do you need any accommodation?  Or do you --

12   have you requested they accommodate you in any way?

13        A      For my daughter, I did.

14        Q      Not for your daughter, I'm --

15        A      No, not for me.  That's why I was asking

16   you.  No, I did not.

17        Q      For -- so for Hadley Farms, you've not

18   requested any kind of a accommodation for any physical

19   impairment that you have?

20        A       No, because I can pretty much walk or, like

21   I said, if a belt's down or something, we can sit so I'm
```

1    not constantly doing the same thing.  I can go from

2    walking to sitting.  If I have issues lifting something,

3    I can have somebody help me lift it.

4          Q      So no need for accommodation there?

5          A      Correct.  Not at this time.

6          Q      And you said you requested accommodation

7    for your daughter?

8          A      Correct.

9          Q      What does that mean?  I don't understand.

10         A      Well, in 2017, my daughter had a health

11   issue and Hadley was nice enough to let me drop her back

12   and forth to chemotherapy.

13         Q      I'm going to review with you just these

14   documents you've produced today.  Are these originals?

15   Or are these copies?

16         A      No.  Those are copies.

17         Q      Okay.

18         A      And I think my copies at home are even

19   copies.  I think the manager keeps the originals.

20         Q      Just because it's not been produced in

21   discovery, but today, I'm just getting away with marking

Terri Cowgill
08/21/2020

243

1    transcriptionist audio.  I suspect that this will be a

2    as verbatim of a transcript as it can possibly be given

3    the very many ways that we've recorded here today.  But

4    you do have a right to review the transcript and make

5    sure that the Court Reporter's accurately transcribed

6    your testimony today.  For example, if at some point,

7    you said today didn't and he heard you as having said

8    did, you can fix, you know, a transcription error.  You

9    can't, obviously, change your testimony.

10                   THE WITNESS:  All right.

11                   MR. JELLINEK:  But you can correct

12   transcription errors but -- or you can waive it and you

13   can rely upon his skill and his video to make sure that

14   they got you all correct.

15                   THE WITNESS:  I would like to read it

16   please.

17                   THE VIDEOGRAPHER:  We are going off the

18   record at 2:50 p.m. This is the end of today's

19   testimony.

20                   THE REPORTER:  You are going to want a

21   rush?

Terri Cowgill
08/21/2020

244

1                      MR. JELLINEK:  Yes.

2                      (Deposition concluded at 2:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1                     A C K N O W L E D G M E N T

2

     STATE OF            )
3                          :SS
     COUNTY OF            )

4

              I, TERRI COWGILL, hereby certify
5    that I have read the transcript of my testimony
     taken under oath in my deposition of August 21,
6    2020; that the transcript is a true, complete and
     correct record of my testimony, and that the
7    answers on the record as given by me are true
     and correct.

8

9                    _____

10

11                       TERRI COWGILL

12

13   Signed and subscribed to before me,

14   this _____ day of_____ , 2020.

15

16

17   _____

18   Notary Public, State of _____

19

20

21

1   State of Maryland

2   City of Baltimore, to wit:

3       I, Eric Leichter, a Notary Public of the State of

4   Maryland, Baltimore City, do hereby certify that the

5   within-named witness personally appeared before me at

6   the time and place herein set out, and after having been

7   duly sworn by me, according to law, was examined by

8   counsel.

9       I further certify that the examination was recorded

10  stenographically by me and this transcript is a true

11  record of the proceedings.

12      I further certify that I am not of counsel to any

13  of the parties, nor in any way interested in the outcome

14  of this action.

15      As witness my hand this 24th day of August, 2020.

16

17                          *Eric M. Leichter*

18                          Eric Leichter

19                          Notary Public

20  My Commission Expires:

21  January  13, 2024