IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TERRI COWGILL, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CASE NO. 1:19-cv-02565-ADC |
| | ) |
| FIRST DATA TECHNOLOGIES, INC., and | ) |
| FISERV SOLUTIONS, LLC, | ) |
| | ) |
|     Defendants. | ) |

## DECLARATION OF DAWN ROWE

Pursuant to 28 U.S.C. § 1746, I, Dawn Rowe, hereby state and declare as follows under oath:

1. I am over the age of 18 and a resident of the United States. I make the following statements on personal knowledge, and on information that I acquired in the regular course of performing my business duties. I offer this Declaration in support of First Data Technologies, Inc.'s ("First Data" or "Company") Motion for Summary Judgment. If called to do so, I could and would testify to the topics contained herein.

2. I am currently employed by First Data as a Team Manager in the Company's Chargeback Response Center in Hagerstown, Maryland and have been in this role since 2008.

3. First Data is a payment processing company.

4. First Data processes credit and debit card transactions for its merchant customers.

5. First Data's call center facility in Hagerstown, Maryland has various departments, including the Chargeback Response Center.

602407819.5

**EXHIBIT C**
to Deft's Motion for
Summary Judgment

6. The Chargeback Response Center receives and resolves inquiries from customers—including individuals, merchants, and financial institutions—related to disputed charges that were processed through First Data's point-of-sale technology.

7. As a Team Manager in the Chargeback Response Center, I am responsible for supervising the phone representatives who work the day shift in that department.

8. Terri Cowgill ("Ms. Cowgill") was employed by First Data at its Hagerstown, Maryland location from July 5, 2004 until September 15, 2015.

9. Ms. Cowgill held the position of Senior Contact Center Representative ("Call Center Representative") from approximately January 2005 until the time of her termination.

10. As a Call Center Representative, Ms. Cowgill was responsible for fielding customer phone calls and addressing inquiries involving disputed credit and debit card transactions.

11. I was Ms. Cowgill's immediate supervisor/manager for the last five years of Ms. Cowgill's employment with First Data.

12. Ms. Cowgill (like all other Call Center Representatives) was given instructions and expectations regarding how to perform her role, how to interact with customers, how to handle calls, what the Company expected of her as far as time of the call, avoiding holds and the like.

13. Instructions and guidelines regarding the call process were made available to Ms. Cowgill (and all other Call Representatives) on-line.

14. Ms. Cowgill (like all other Call Center Representatives under my supervision) was also given instructions regarding the Company's expectations in individual meetings with me (referred to by the Company as "one down" or "one-on-one" interactions).

15. Among other things, Ms. Cowgill (like all other Call Center Representatives) was instructed to provide prompt, efficient, polite and courteous service to First Data's customers.

16. Ms. Cowgill (like all other Call Center Representatives) was also instructed to avoid inappropriate language.

17. Ms. Cowgill (like all other Call Center Representatives) was also instructed to avoid what the Company referred to as "call avoidance," which encompassed a broad category of behaviors such as: not taking a call in the system; logging out of the phone system unnecessarily; not answering or "opening" a call promptly; needlessly hanging on the phone line; and releasing a call prematurely.

18. Ms. Cowgill (like all other Call Center Representatives) was expected to make certain efforts to engage with a customer on the phone before disconnecting any phone call, including, among other things, introducing herself, identifying the department she was in, and saying hello to the customer at least three times.

19. If it did not appear that a caller was on the line, Ms. Cowgill (like all other Call Center Representatives) was supposed to say hello or make contact efforts three times before terminating the call.

20. The instruction to attempt to make contact three times was designed to improve customer service so that callers did not become upset with a prematurely terminated call.

21. When Ms. Cowgill (or any other Call Center Representative) spoke to customers (merchants, banks, cardholders and other company departments) on the phone, personnel in the Company's Quality Department monitored and/or reviewed such calls (which were recorded).

22. The Quality Department was located in a different location from the Hagerstown, Maryland facility.

23. If Quality Department personnel heard something on a call that did not comport with the Company's expectations for Call Center Representatives, the issue would be shared with the Call Center Representative's Team Manager, and the Team Manager would discuss the issue with the Call Center Representative.

24. In addition to the Quality Department monitoring and reviewing calls, Team Managers over the Call Center Representatives (like me) were also able to review calls to monitor Call Center Representatives' performance.

25. As part of regular call monitoring and monthly scoring, I reviewed a recorded call that Ms. Cowgill received and handled on July 10, 2015.

26. I listened to the call and believed that Ms. Cowgill had become argumentative with the caller and that Ms. Cowgill had terminated the call abruptly / prematurely.

27. I believed that Ms. Cowgill did not demonstrate appropriate restraint and courtesy on the call and that her abrupt/premature termination of the call constituted call avoidance.

28. I met with Ms. Cowgill on August 4, 2015 to discuss the July 10, 2015 call.

29. During this meeting, I informed Ms. Cowgill that I had become aware of the July 10, 2015, call, that there were issues with the call, and that I wanted to review the call with her.

30. Also during this meeting, I played the recording of the call for Ms. Cowgill.

31. After reviewing the call with Ms. Cowgill on August 4, 2015, I told Ms. Cowgill that, in my opinion, Ms. Cowgill had been argumentative with the caller, and that she had terminated the call prematurely.

32. During the August 4, 2015, meeting, I informed Ms. Cowgill that her conduct on the call did not comport with the Company's service expectations.

33. On August 4, 2015, I informed Ms. Cowgill that she was being placed on a 90-day Improvement Action Plan ("IAP") for engaging in conduct that constituted call avoidance.

34. The IAP stated that further instances of call avoidance could result in Ms. Cowgill's termination.

35. Ms. Cowgill signed the IAP document on August 4, 2015, acknowledging that she understood the basis for the IAP and that any future instances of call avoidance could result in her termination.

36. Attached to this Declaration as Exhibit A is a true and accurate copy of the IAP I delivered to Ms. Cowgill on August 4, 2015.

37. Ms. Cowgill did not attempt to challenge the receipt of her IAP through any formal Company process available to her.

38. On September 9, 2015, a customer submitted a negative "voice of the customer" survey regarding Ms. Cowgill following a call Ms. Cowgill fielded.

39. The "voice of the customer" survey was directed to my attention.

40. The customer reported that Ms. Cowgill had hung up on the customer prior to providing any service.

41. On September 15, 2015, I met with Ms. Cowgill to discuss the September 9, 2015 voice of the customer survey.

42. During the September 15, 2015, meeting, I played a recording of the phone call that had prompted the customer's negative voice of the customer survey.

43. On the recording of the call, a man could be heard talking in the background for approximately 26 seconds and a man said "hello" just before Ms. Cowgill disconnected the call.

44. The recording reflected no greeting at the beginning of the call or any evidence that Ms. Cowgill made any attempt to engage with the customer prior to disconnecting the call.

45. I asked Ms. Cowgill whether there was any issue with her equipment and she stated there was not.

46. Having confirmed there was nothing wrong with Ms. Cowgill's equipment, based on the recording, I determined that Ms. Cowgill had committed another act of call avoidance in that she made no effort to engage with the customer and prematurely disconnected the call.

47. During the September 15, 2015, meeting, I informed Ms. Cowgill that this further act of call avoidance constituted a violation of her IAP and would, therefore, result in her termination.

48. First Data terminated Ms. Cowgill's employment on September 15, 2015.

49. Ms. Cowgill did not dispute the basis for her termination during her September 15, 2015, meeting with me and made no subsequent efforts to appeal her termination through any internal Company channels.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 15 day of September, 2020.

_____
Dawn Rowe





**EXHIBIT A**

## Improvement Action Plan (IAP)

**Employee First Name:** Terri  
**Employee ID#:** 188273  
**Employee Title:** Senior Contact Center Rep  
**Corrective Action Type:** Conduct  
**Corrective Action Level:** 90 Day  
**Consulted with ER Partner:** Annette Wood  

**Employee Last Name:** Cowgill  
**Department:** Chargeback Response Center  
**Location:** Hagerstown  
**Manager/Supervisor:** Dawn Rowe  
**Date IAP Created:** July 28, 2015  

### Introductory Statement:

Daniel, First Data expects all Owner Associates to demonstrate the highest degree of integrity, responsibility and professionalism at all times. Employee conduct must not interfere with daily operations and to conduct business at all times in a constructive and professional manner. In order to service our clients, call avoidance is a type of action that affects our product in a negative fashion and jeopardizes the relationship between customers and clients.

Call avoidance consists of but is not limited to the following:
- Not completely signing on/off the system/phone
- Not answering the call
- Placing or receiving personal calls
- **Releasing calls prematurely**
- Sleeping at the workstation (could possibly miss a call)
- Placing your phone line on hold, in "after call" or AUX unnecessarily
- Remaining on the line when transferring calls unnecessarily
- Partially signing on/off the system
- Accessing internet without a legitimate business reason

Employees who conduct any of the above forms of call avoidance may have their employment terminated, because of the negative impact to our customers.

In addition, all Client Care Organization Owner Associates are expected to behave in an appropriate manner at all times, are expected to embody the highest ethical standards, satisfy the client by exceeding their expectations, and treat people with dignity and respect. Within the environment of the Call Center, we promote a pleasant, productive, and professional environment for our clients and employees. Everyone should be treated equally with dignity and respect, especially when speaking to clients via the phone. It is CCO's interest to work with you to prevent similar situations in the future. This document is geared to improve your call management/handling skills for the future. The problem areas are outlined below as well as what you must do to improve. You are being placed on an Improvement Action Plan for 90 days, beginning July 28, 2015 until October 28, 2015.

*Terri,* future engagement in these above mentioned activities will be considered a violation of First Data's Code of Conduct and this 90 day Improvement Action Plan. As a result further disciplinary action, up to an including termination, will be necessary.

**EXHIBIT 6**

Case 1:19-cv-02565-ADC   Document 52-5   Filed 09/17/20   Page 8 of 8



### Detail of Issue(s)

**Problem/Business Impact:**
A recorded call from July 10, 2015 was monitored as part of your monthly quality scoring. During this call you became argumentative with the Client then disconnected the call. Recording ID 9123740049570001151.

**Expectation/SMART Goal:**
Terri, you are expected to be available to assist Clients while logged into the phone, handle all of the calls received and not prematurely disconnect any calls. You are also expected to immediately report any concerns with your phone or headset not functioning properly. You are also expected to improve and maintain improvement in your call handling skills. We will meet on a weekly basis at 10:30am every Thursday starting August 13, 2015. During these meetings we will review a recorded call and discuss any opportunities that may arise. These meetings are a shared responsibility, if you are unable to make a scheduled meeting time it is your responsibility to reschedule. Further instances of call avoidance or unprofessionalism may result in further corrective action including termination.

### IAP Policy and Restrictions:

This Improvement Action Plan will remain in effect for 90 days. This document and your progress will be reviewed periodically during this time period. If at any time during this period you have failed to meet the above objectives, your employment may be terminated. If you consistently meet the above objectives for the entire length of the plan, this Improvement Action Plan will be discontinued. In addition, you must sustain improved performance in the future. Failure to meet and sustain the objectives of this plan, or other performance issues occurring at any time during or after this plan, will result in further corrective action, up to and including the immediate termination of your employment. **During and after this plan, your employment remains at will and either you or the company can terminate your employment for any reason.**

Any employee on a current Improvement Action Plan (IAP) may not be eligible for a merit increase.

Additionally, you cannot post for other positions or be promoted during the term of your plan.

Finally, Tuition Assistance is generally not available to any employee on an IAP plan at any point during their course enrollment.

### Statement of Understanding:

I understand that my signature is acknowledgement that I have discussed this document with my manager. I have read and understand the document and realize that I have placed my position in jeopardy. I realize the course of action that will be taken if I am unable to successfully meet these expectations. I have been given a copy for my records.

Employee Signature: _[signature]_   Date: Aug 4th '15

Manager's Signature: _[signature]_   Date: _[signature]_

Once signed – IAP Provisioning:
1. Copy to Employee
2. Copy to Manager File
3. Copy to the HRSC – Fax# 877-217-3719 or email: HRSolutions@firstdata.com

2 | Page

PLTF EEOC-0172