IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRI COWGILL,                              )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )
                                            )    CASE NO. 1:19-cv-02565-ADC
FIRST DATA TECHNOLOGIES, INC., and )
FISERV SOLUTIONS, LLC,                      )
                                            )              FILED _____ ENTERED
        Defendants.                         )          _____ LODGED ⟨2⟩ RECEIVED
                                            )
                                            )              OCT 3 0 2020
                                            )
                                                         AT BALTIMORE
*    *    *    *    *    *    *    *    *    *    CLERK U.S. DISTRICT COURT
                                              BY    DISTRICT OF MARYLAND
                                                                    DEPUTY

## PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Terri Cowgill ("Ms. Cowgill"), hereby submits her Opposition to
Defendant's, First Data Technologies, Inc. ("FIRST DATA"), Motion for Summary Judgment,
and in support thereof states as follows:

### I.      STATEMENT OF FACTS

1.      For over eleven years, from July 5, 2004 through September 14, 2015, Ms. Cowgill
served as a Call Center Representative with FIRST DATA. *See* Affidavit of Terri A. Cowgill
("Cowgill Aff") at ¶2, attached hereto as **Exhibit 1.**

2.      Except for a 30 day warning at the beginning of her career, Ms. Cowgill had a
spotless disciplinary record for over nine years until she was suddenly disciplined during the final
two months of her employment with FIRST DATA and abruptly terminated. *See* Ms. Cowgill Aff
at ¶3 and Deposition of Terri A. Cowgill at page ("p.") 134, attached hereto as **Exhibit 2** (hereafter
"Cowgill Dep").

3.     Ms. Cowgill routinely received above average performance reviews during her tenure, and the 2014 year end performance review shows she met or exceeded her expectations for that year. Ms. Cowgill's Midyear performance review in 2015 again showed she met or exceeded all expectations for the period of January 1, 2015 to April 30, 2015. For over a decade at FIRST DATA, prior to her becoming disabled, Ms. Cowgill was never disciplined, nor placed on an Improvement Action Plan. Cowgill Aff. at ¶4.

4.     On January 5, 2015, Ms. Cowgill sustained a significant back injury as a result of a serious car accident. As a result of the injury to her back, Ms. Cowgill experienced back and neck pain and headaches. Cowgill Dep. at p. 189.

5.     Due to the neck and back pain that Ms. Cowgill experienced, she could not sit for prolonged periods or even lay down without significant pain. Cowgill Dep. at pp. 133:189-190.

6.     To this day, Ms. Cowgill cannot engage in certain normal daily activities that she could prior to the accident. Cowgill Depo. at pp. 218-219. These normal daily activities include, but are not limited to, standing, sitting, lifting, reaching, sleeping, working, and performing manual tasks. Cowgill Dep. at p. 133; 218-219 (note Cowgill was interrupted at p. 218 as she was describing her disability); Cowgill Aff. at ¶6 *See also* the July 3, 2018 email from Ms. Cowgill to Janel Griffin, EEOC, which ultimately found that Ms. Cowgill was a qualified individual with a disability, attached hereto as **Exhibit 3.** See also EEOC Determination dated March 21, 2019 attached hereto as **Exhibit 17.**

7.     Specifically, the injury affected Ms. Cowgill's major life activities, including, but not limited to: (1) sitting or standing for an extended amount of time; (2) lifting, bending and reaching for things without irritating her back and needing to take a

break; (3) sleeping; and (4) showering and bathing. Cowgill Aff. at ¶7; Cowgill Dep. at 191-192;

8.      The accident required that Ms. Cowgill work a reduced schedule because her medical condition prevented her from sitting for prolonged periods. Cowgill Dep. at pp. 137, 143 and 187. See also Cowgill Medical Records attached hereto as **Exhibit 16.**

9.      On January 15, 2015, approximately 10 days after the accident, Ms. Cowgill requested medical leave under the Family and Medical Leave Act. ("FMLA"). Cowgill Aff at ¶9.

10.     Pursuant to her physician's instructions, Ms. Cowgill requested intermittent leave to attend physical therapy and a reduction of her schedule to four hours per day, three to five days per week. Cowgill Dep. at pp. 146-148.

11.     On January 26, 2015, Ms. Cowgill was advised that this request was retroactively approved as of January 15, 2015. Cowgill Dep. at pp. 152-153

12.     Dawn Rowe ("Rowe") was Ms. Cowgill's supervisor at the time of her request for FMLA leave and a reasonable accommodation for her disability under the ADA. *See* Affidavit of Dawn Rowe, Exhibit C ("MSJ, Exhibit C") to Defendant's Memorandum in Support of Motion for Summary Judgment ("MSJ").

13.     Prior to her FMLA and disability, Ms. Cowgill did not have any disciplinary issues with Rowe for the nearly five years that she worked for Rowe. Cowgill Dep at p. 70; 138-139. Cowgill Aff at ¶41

14.     Rowe's attitude toward Ms. Cowgill changed after she requested FMLA. Cowgill Dep. at pp. 139-140. By way of example, Rowe barely responded to Ms. Cowgill's good morning greetings immediately after the request for FMLA and reasonable accommodation request. *Id.*

This conduct is a violation of the FIRST DATA Harassment Policy. See FIRST DATA Harassment Policy attached hereto as **Exhibit 4.**

15.     Not only did Rowe's attitude toward Ms. Cowgill change, but Rowe's conduct towards and statements to Ms. Cowgill indicated that Rowe did not want to, and refused, to make accommodation for Ms. Cowgill's disability and reasonable accommodation. Cowgill Aff at ¶¶15, 17-20;Cowgill Dep. at pp. 145 -146.

16.     FIRST DATA failed to provide the requested leave and accommodation. FIRST DATA only granted her leave to attend physical therapy, but did not reduce her schedule to 4 hours, 3 to 5 days per week. Cowgill Aff·at ¶17; Cowgill Dep. at pp. 136, and 148-151; To the contrary, Cowgill was required to work mandatory overtime when she was supposed to have a reduced schedule to accommodate her disability. *Id.*

17.     As a result, Ms. Cowgill was forced to sit for prolonged periods at work contrary to her physician's instructions with regard to her FMLA and accommodation request. Cowgill Aff. at ¶18.

18.     FIRST DATA did not engage in any interactive dialogue with Ms. Cowgill regarding her scheduling request as required under the ADA. Cowgill Aff at ¶19.

19.     On numerous occasions, Ms. Cowgill raised FIRST DATA's failure to accommodate her request for a reduced schedule in accordance with her request for FMLA and the reasonable accommodation for her disability with her supervisor Rowe; yet, Rowe never took any action to provide the requisite leave and accommodations. Cowgill Aff at ¶¶ 17-20; Cowgill Dep. at p. 137, and 148-151.

20.     For almost nine years, Ms. Cowgill had no work issues. She filled out her FMLA leave papers and all of her troubles began. Cowgill Dep. at p. 134.

4

21.     Within a month of her FMLA and ADA request for this reasonable accommodation due to her disability, FIRST DATA retaliated against Ms. Cowgill by issuing a Final Written Warning ("Final Warning"") on February 11, 2015. *See* Final Written Warning attached hereto as **Exhibit 5** Cowgill Dep. at pp. 125-126, 155-156.

22.     This Final Warning was harassment for Ms. Cowgill  using her FMLA and ADA rights and also constitutes a violation of the FIRST DATA Harassment policy. *See* **Exhibit 4.**

23.     The Final Warning was related to Ms. Cowgill's time off for her physical therapy in accordance with her FMLA request, which FIRST DATA unlawfully classified as unexcused absenteeism. **Exhibit 5.**

24.     In addition to the basis for the discipline being erroneous, FIRST DATA did not follow its own policy regarding progressive discipline as outlined in the various FIRST DATA policies and instead placed her on a Final Warning. Cowgill Aff at ¶25; *See* Exhibit 4, FIRST DATA Harassment Policy at p. 4; Section IV ("Disciplinary Actions"); *See also*, excerpt from FIRST DATA U.S. Employee Handbook, attached hereto as **Exhibit 6.**

25.     FIRST DATA's discipline policy contemplates the use of verbal and written counseling and suspension prior to termination. *Id.*

26.     Given that Ms. Cowgill did not have any attendance issues over her eleven (11) year career with FIRST DATA, the discipline was particularly harsh and suspicious, raising the strong presumption that the act was unlawful discrimination. Cowgill Aff at ¶¶ 2, 3, 21, 24

27.     Ms. Cowgill met with Rowe about the Final Warning. At the meeting, Ms. Cowgill asked several times when her reduced schedule would begin. In response, Rowe repeated the same statement, "you are required to be at work" at least three times. Cowgill Aff at ¶22

5

28.     At this time, FIRST DATA was requiring their call center representatives to work mandatory overtime because of staffing issues, which were caused by FIRST DATA's large scale employee terminations. See Mandatory Overtime attached hereto as **Exhibit 7;** Cowgill Aff. at ¶26.

29.     Upon receipt of the Final Warning in February, Ms. Cowgill complained to Annette Wood ("Wood"), the FIRST DATA Human Resources Representative that the Final Written Warning constituted harassment and unlawful retaliation against her by Rowe for taking leave, and a not so subtle threat to her job. Cowgill Dep. at p. 127;193. Notwithstanding her complaint, Wood did not open an investigation into the alleged retaliation by Rowe. Cowgill Aff. at ¶¶27.

30.     Wood has engaged in harassing conduct of another employee who took time off for work in violation of the FMLA. Cowgill Dep. at pp. 194-196.   Amanda Parmer took FMLA for maternity leave, and Wood called Ms. Parmer at home and harassed her during her FMLA leave in an effort to force her to return to work. *Id.*

31.     After Ms. Cowgill voiced her opinion that the Final Warning was unlawful and in retaliation for her taking leave and needing a reasonable accommodation for her back injury, Wood agreed to remove the Final Warning from her personnel file. Cowgill Aff. at ¶32.

32.     Wood never conceded to Ms. Cowgill that FIRST DATA had made a mistake and never apologized to Ms. Cowgill for issuing the Final Warning.  Cowgill Aff. at ¶¶30, 32 Instead, Wood advised Ms. Cowgill that her Final Warning was removed because she was a "good rep." Cowgill Dep. at p. 128.

33.     Ms. Cowgill believed that the Final Warning was issued to intimidate her from not taking the leave for therapy or demanding the reduction in her schedule as mandated by her FMLA request.  Cowgill Aff. at ¶31

6

34.    Ms. Cowgill's belief was buttressed by Wood's statement to her that she [Ms. Cowgill] "needed to do what she had to do to protect her job," which made no sense given that it was FIRST DATA's error to correct.  Cowgill Aff.  at ¶28.

35.    In Ms. Cowgill's opinion, the only reason her job would be at risk was because she was taking legally protected leave and obtaining reasonable accommodation for a disability when FIRST DATA  was requiring its call center representatives to work mandatory overtime.  *Id* Cowgill Aff at ¶¶ 27-29.

36.    Over the next several months, Ms. Cowgill took leave for her physical therapy but she never received the reduced schedule she was entitled to under the FMLA and ADA. Cowgill Aff at ¶33; Cowgill Dep at p. 150.

37.    On August 4, 2015, Ms. Cowgill was disciplined for a phone call that she handled on July 10, 2015. Cowgill Aff at p. 135. Although Ms. Cowgill was monitored daily for over a decade, this was the first discipline concerning Ms. Cowgill's conduct on a phone call.  Cowgill Aff. at ¶34.

38.    This notification was extremely unusual considering the company's standard practice of reviewing questionable calls within two days. FIRST DATA deviated from its standard disciplinary procedure by waiting almost a month to address the call with Ms. Cowgill before placing her on an Improvement Action Plan ("IAP"). See IAP attached hereto as **Exhibit 8.** Cowgill Dep at pp. 135, 141-142. This was the first disciplinary action taken against Ms. Cowgill since she was given a 30 day warning in September 2006. Cowgill Dep. at p. 117 ; Cowgill Aff at ¶35; *See also,* Level One Warning attached hereto as **Exhibit 9.**

39.    Ms. Cowgill's calls were monitored by FIRST DATA's Quality Control ("QC") job function. Cowgill Aff. at ¶37 . QC was not staffed by management employees. *Id*. at ¶

7

40.     At the time of this first discipline, Ms. Cowgill was rated at a 3 on a scale of 1 to 3 for her job performance. Cowgill Aff. at ¶39, Cowgill Dep. at p. 135.

41.     In addition, Ms. Rowe, and not QC, identified the disciplinary issue. Rowe had supervised Ms. Cowgill for five (5) years and had never previously disciplined her, or even given her an oral warning with regard to her conduct on calls. See MSJ, Exhibit C at ¶¶11 and 25; Cowgill Aff. at ¶¶40-41.

42.     Rowe met with Ms. Cowgill on August 4, 2015 to issue the IAP. At the meeting, Rowe curiously began by discussing Ms. Cowgill's pending FMLA and ADA recertification. Cowgill Aff at ¶¶42-43; Cowgill Dep. at pp. 96-97. See August 9, 2015 assessment[1] at **Exhibit 16**. By linking Ms. Cowgill's protected legal status with this discipline, Rowe ostensibly violated FIRST DATA's Harassment Policy.

43.     The FMLA and ADA recertification once again required that Ms. Cowgill to receive leave and a reduced schedule, which had never been provided, through February of 2016. Cowgill Aff. at ¶¶43-44; Cowgill Dep. at p. 136.

44.     During the course of her treatment, Ms. Cowgill's physician expressed concern that FIRST DATA'S failure to accommodate was affecting her healing for which FIRST DATA expressed no concern. Cowgill Aff. at ¶45; Cowgill Dep. at pp. 187-188. See June 1, 2015 Assessment at **Exhibit 16[2]**.

45.     At the time of the August 4, 2015 recertification, FIRST DATA was still requiring call center representatives to work mandatory overtime. Cowgill Aff. at ¶46; Cowgill Dep. at p. 135.

---

[1] Ms. Cowgill's Doctor notes pain is persistent and Ms. Cowgill may miss work 2-3 days per month.
[2] Even on June 1, 2015 , Ms. Cowgill was experiencing progressively worsening pain

8

46.     The July, 2015 phone call, which resulted in the IAP was with a continuing client who was recognized as being difficult. Cowgill Aff. at ¶34; Cowgill Dep. at p. 98.

47.     When handed the IAP, Ms. Cowgill immediately raised the issue of retaliation for her FMLA leave and the accommodation for her disability and asked Rowe if there was a target on her back. Cowgill Aff. at ¶48; Cowgill Dep. at pp. 92-93.

48.     Ms. Cowgill also stated to Rowe words to the effect that suddenly she could not do anything right.  Cowgill Dep. at p. 194.

49.     FIRST DATA policy mandates a supervisor to investigate a complaint of unlawful retaliation, but Rowe, who was required to follow the policy and elevate Ms. Cowgill's complaint, failed to do so. *See* Exhibit 4; Cowgill Aff. at ¶49;

50.     As with the prior Final Warning that was rescinded as an alleged "mistake", Ms. Cowgill was not provided a warning, verbal or written counseling and FIRST DATA did not follow its progressive discipline policy and, instead, it immediately placed Ms. Cowgill on IAP for ninety (90) days for this one phone.  Cowgill Aff at ¶50.

51.     FIRST DATA circumvented its progressive discipline policy because she had informed Rowe that she would be recertifying her FMLA at the beginning of the August 4, 2015 meeting and because she believes the erroneous and unlawful Final Warning issued to her on February 11, 2015 had not been removed from her file as represented. Cowgill Aff. at ¶51; Cowgill Dep. at 127-128

52.     The IAP did not require immediate termination for another call center violation. Ex. 12; Cowgill Aff. at ¶53; **Exhibit 8.**

53.    The IAP required weekly meetings to coach Ms. Cowgill; however, Rowe failed to comply with her own IAP and never scheduled or held the weekly coaching meetings. Cowgill Dep. at p. 135. **Exhibit 8.**

54.    Ms. Cowgill met her duty under FIRST DATA Harassment Policy when she complained to Rowe that she was being harassed due to her FMLA leave and related reduced schedule. She did not notify Wood that she believed the IAP was retaliation for her FMLA and ADA accommodations because she believed it was futile action. Wood had previously failed to open an investigation when she claimed retaliation over the Final Warning, refused to acknowledge their mistake, and issue the thinly veiled threat to her job by stating that Ms. Cowgill needed to "protect" her job. Cowgill Aff. at ¶52; Cowgill Dep. at pp. 127-128;193.

55.    Upon receipt of her discipline on August 4, 2015, Ms. Cowgill advised her co-worker Amanda Parmer that she believed she was disciplined because Rowe was "pissed" at her for taking intermittent FMLA leave. Cowgill Aff. at ¶54; Cowgill Dep. at pp. 130-131; 210-2020.

56.    On September 10, 2015, Ms. Cowgill answered a call and greeted the caller. She heard a man talking in the background but no one responded. Cowgill Aff. at ¶¶55-57; Cowgill Dep. at p. 220. Ms. Cowgill asked three times if there was someone on the line before she initiated the termination of the call. Id. Cowgill Dep. at p. 220.

57.    In addition to meeting FIRST DATA'S requirements, Ms. Cowgill disputes whether she hung up the phone in a way that violated company policy. Cowgill Aff. at ¶¶58, 61; Cowgill Dep. at pp. 100-101. Ms. Cowgill's recollection of the call was that no one responded to her greeting and she only heard voices in the background. After about 30 seconds of the caller not responding, she initiated a disconnection. After the disconnection was initiated, Ms. Cowgill heard

10

a man say "Hello?" and attempted to reconnect the call, but at this point the call was irretrievable. Cowgill Aff. at ¶58

58.    Rowe admits that a representative can terminate the call if there is no response after three requests. See MSJ, **Exhibit C** at ¶18. See also Unemployment Insurance Appeals Decision dated November 24, 2015 attached hereto as **Exhibit 10.**

59.    At the unemployment hearing, Rowe stated that a representative could hang up after the opening announcement if there was no response. Cowgill Dep. at pp. 209-210; **Exhibit 10.**

60.    On September 10, 2015, Rowe requested that Ms. Cowgill be terminated because she prematurely terminated a call. *See* Rowe Termination Request  dated September 10, 2015 attached hereto as **Exhibit 11**; Cowgill Aff at ¶57.

61.    Shelly Williams, the FIRST DATA Employee Relations Manager, in Omaha, Nebraska was a decision maker in the termination of Ms. Cowgill. *See* email string between Dawn Rowe and Shelley Williams dated September 14, 2015 attached hereto **Exhibit 12**; Cowgill Dep. at pp. 220-221.

62.    Rowe was challenged on this request by Shelly Williams, who noted that Ms. Cowgill was hired in 2004 and was given a top ranking of 3 over the past years. *See* **Exhibit 12.** Williams wanted to know what had suddenly changed about Ms. Cowgill so that her performance was now an issue. Id.

63.    Williams specifically questioned issuing a Final Warning as the "first level" of discipline suggesting that this was severe. *Id.*   Williams suspicions were well-founded, as she was not aware that Ms. Cowgill was taking  FMLA and  ADA leave which Rowe held strong animus against.

64.     In her response to Williams on September 14, 2015, Rowe falsely stated that Ms. Cowgill had a history of declining performance and other performance issues outside of the single July 2015 call that caused the August 4, 2015 Final Warning. *Id.* Williams relied on these false representations to approve the termination of Cowgill. See **Exhibit 12**

65.     A review of the MSJ and all other evidence in this case does not establish any record of poor or declining performance prior to the August 4, 2015 Final Warning as claimed by Rowe.

66.     Even though the IAP did not require that Cowgill be terminated for another violation, Ms. Cowgill was terminated on September 14, 2015 after allegedly releasing a call too early. Cowgill Aff. at ¶56; Cowgill Dep. at p. 123.

67.     At the time of her termination, Ms. Cowgill was approved for intermittent leave and a reduced schedule through February of 2016. Cowgill Aff. at ¶56.

68.     Cowgill attributes her termination to the renewal of the reduced schedule request which FIRST DATA and her supervisor Rowe could not live with due to staffing issues and the need for call representatives to work mandatory overtime. Cowgill Dep. at 201-202;204.

69.     FIRST DATA terminated Ms. Cowgill for two allegedly substandard telephone interactions over her decade plus career. **Exhibit 12.**

70.     In a failed attempt to establish it terminated similarly situated employees for the conduct for which Ms. Cowgill was terminated, FIRST DATA identified two employees as comparators to the EEOC. *See* Letter from First Data Counsel to Rosemarie Rhodes, EEOC, April 1, 2019. attached hereto as **Exhibit 13**.

71.     The first employee, #273491 ("Employee A"), was only employed for a little over a year and one half, whereas Ms. Cowgill was an employee with a spotless record for over a near decade. *See* **Exhibit 13.**

12

72.    Employee A had many violations that Ms. Cowgill did not, including, but not limited to; walking away from a pending call for ten minutes, using her cellular phone on the production floor, accessing an inappropriate website, and attendance issues. *Id.*

73.    Employee A was not placed on an immediate Final Warning for call avoidance as was Cowgill. She was given an "NTF" (Note to File) for her first incident. *Id.* at p. 4 of 7. Employee A was also given a Second Level PIP (Performance Improvement Plan) before a Final Warning. *Id.* at p. 3 of 7. FIRST DATA conveniently omitted did not produce this Second Level Warning to the EEOC. *Id.*

74.    Employee A was also given special attention including moving her work station next to two Team Leaders who could provide her support and assistance. By comparison, Ms. Cowgill was not even provided the weekly coaching required under her IAP, but rather one meeting where she was told to "play pretty". Cowgill Dep. at pp. 134-135. This factor alone distinguishes the comparator from Ms. Cowgill. It is also evidence that the IAP was retaliatory and not intended to be constructive as designed. *Id.* at 30-32; Cowgill Aff. at ¶64;

75.    The second comparator, Employee B, was also a short-term employee compared to Ms. Cowgill's tenure. Employee B was hired on November 17, 2017 and terminated within three months after for numerous acts of employee misconduct. Ex. 16 at p. 6; Cowgill Aff. at ¶65.

76.    Again, unlike Ms. Cowgill, Employee B was afforded progressive discipline not provided to Ms. Cowgill. Like Employee A, Employee B had continuing attendance problems, and had at least three (3) violations of workplace rules, including two within a few days. *Id.*

77.    Employee B engaged in acts such as punching in and taking excessive time to go to his desk, and then walking away from his desk and putting the merchant on hold so he could go

to the bathroom. *Id.* This conduct is undisputedly more severe than Cowgill's conduct, terminating a call after almost thirty seconds, which resulted in her termination.

78.    The Employee B was placed on a final PIP for attendance and call avoidance. *Id.* at p. 33. Employee B was given a Final PIP only after engaging in two violations within 10 days. Ms. Cowgill was placed on a Final Warning only after *a single, less severe* violation.

79.    The only common factor between Ms. Cowgill and the alleged comparators cited by FIRST DATA was that attendance was part of the issue; however, unlike the comparators, Ms. Cowgill's absences were lawful under her FMLA leave and FIRST DATA was obligated by the ADA to accommodate her disability.

80.    FIRST DATA was asked to produce a copy of this call recording by the Maryland Department of Labor and Licensing but declined to do so. Cowgill Dep. at pp. 209-210. Cowgill Aff. at ¶59. See Employer Fact Finding Memo attached hereto as **Exhibit 14.**

81.    The EEOC required that this call evidence be preserved. *See* Notice of Charge of Discrimination attached hereto as **Exhibit 15.**

82.    FIRST DATA has failed to produce and to preserve this evidence.

83.    To date, although requested to do so, FIRST DATA has refused to produce this call. Cowgill Aff. at ¶59

84.    Rowe admitted at the Maryland Department of Labor and Licensing Regulation ("DLLR") hearing that Ms. Cowgill was permitted to release the call if there was no response. Cowgill Aff. at ¶62; Cowgill Dep. at p. 210. **Exhibit 10.**

85.    The DLLR Hearing Examiner took the testimony of Rowe and Ms. Cowgill and made a factual finding that FIRST DATA policy permitted Ms. Cowgill to hang up the phone call after her introduction if there was no one responding to the call. Cowgill Aff. at ¶60; **Exhibit 10**

14

The Hearing Examiner also found that Ms. Cowgill "…had given the introduction and followed the appropriate procedures on the call." *Id.* **Exhibit 10.** [3]

86.     FIRST DATA falsely stated to the DLLR that Ms. Cowgill engaged in a discussion on that September call and advised the customer she was not going to argue with the customer and hung up. Cowgill Aff at ¶61; Cowgill Dep. 178-179; **Exhibit 14.**

87.     This false claim originated from Rowe who incorrectly conflated Ms. Cowgill's alleged conduct in the July 10, 2015 with the September 2015 call where there was no customer interaction ultimately resulting in Ms..Cowgill's termination. Cowgill Aff. at ¶61; **Exhibit 12; Exhibit 14.**

## II.     MATERIAL FACTS IN DISPUTE WHICH PRECLUDE SUMMARY JUDGMENT

·1.     Whether the issuance of the Final Warning for attendance, which was approved FMLA leave, was inadvertent error or intimidation tactic and retaliation for taking medical leave and thus establishes FIRST DATA's animus against Ms. Cowgill due to her disability.

2.     Whether Annette Wood, of FIRST DATA HR, retaliated against Ms. Cowgill for her absenteeism related to her disability.

3.     Whether Rowe's treatment of Ms. Cowgill, including her personal interactions with Ms. Cowgill, establishes animus against Ms. Cowgill due to her disability and related requests for reasonable accommodation.

4.     Whether the issuance of the August 4, IAP was retaliation for taking medical leave and thus establishes FIRST DATA's animus against Ms. Cowgill due to her disability.

---

[3] Plaintiff has requested a copy of the transcript of the hearing and will supplement the record when it is received

5.     Whether the issuance of a Final Warning and IAP on August 4, 2015 was inconsistent with FIRST DATA's progressive discipline policy and practice constituting disparate treatment due to Ms. Cowgill's disability.

6.     Whether the facts and circumstances of the customer interaction on July 10, 2015 supports issuance of a Final Warning and IAP to an employee with a more than decade of a spotless record of performance.

7.     Whether the decision to terminate Ms. Cowgill due to her September 10, 2105 phone call incident and one prior disciplinary action was a departure from FIRST DATA's disciplinary procedure.

8.     Whether the comparator evidence produced by FIRST DATA establishes that Ms. Cowgill received a more severe discipline for objectively a lesser offenses when compared to the comparators discipline for more egregious conduct violations thereby constituting disparate treatment due to Ms. Cowgill's disability.

9.     Whether the timing of the start of the harassment against Ms. Cowgill establishes that FIRST DATA was motivated to terminate Ms. Cowgill due to her disability.

10.     Whether FIRST DATA departed from its standard disciplinary standards and terminated Ms. Cowgill due to her disability under the ADA.

11.     Whether FIRST DATA engaged in the required interactive dialogue for Ms. Cowgill's disability accommodation requests.

12.     Whether Ms. Rowe listened to the call and believed that Plaintiff had become argumentative with the caller, and that Plaintiff had terminated the call abruptly. Exhibit B, 100:10-101:3; Exhibit C. ¶26; Exhibit C, ¶27.

13. Whether the calls at issue constituted "call avoidance." Exhibit B, 100:10-101:3; Exhibit C. ¶26; Exhibit C, ¶27.

14. During the September 15, 2015, meeting, Ms. Rowe played a recording of the phone call that had prompted the customer's voice survey corrections. Exhibit B, 120:14-15, 123:11-13, Exhibit C, ¶42. *Ms. Cowgill attempted to contact or greet the caller three times before initiating the disconnect, and by the time she heard any response, it was too late for her to retrieve the call.* **Cowgill Aff. At ¶57 - 58**

15. The recording reflected no greeting at the beginning of the call or any evidence that Plaintiff made any attempt to engage with the customer prior to disconnecting the call. Exhibit B, 120:19-121:4, 122:3-8, 123:11-21, Exhibit C, ¶44 *As mentioned above, Plaintiff maintains that she attempted multiple times to greet the caller but received no response until after she initiated the disconnect from the call.* **Cowgill Aff. at ¶57 – 58.** *First Data never played the recording for Ms. Cowgill in its entirety and they refused to produce the recording.* Cowgill Aff. at ¶59; **Exhibit 14.**

16. Ms. Rowe asked Plaintiff whether there was any issue with her equipment and she stated there was not. Exhibit B, 131:14-132:21, Exhibit C, ¶45. Based on the recording, and having confirmed there was nothing wrong with Plaintiff's equipment, Ms. Rowe determined Plaintiff had committed another act of call avoidance because she made no effort to engage with the customer and prematurely disconnected the call. Exhibit B, 122:9-15, 123:5-10; Exhibit C, ¶46 *Ms. Cowgill responded that she did not know if there were any problems with her equipment. Rowe never inspected the equipment to determine if it was working or not.* Cowgill Aff. at ¶57. *Plaintiff maintains that she made multiple attempts to engage with the customer, but did not hear any response.* **Cowgill Aff. At ¶57 – 58.**

17.     Ms. Rowe informed Plaintiff that this further act of call avoidance constituted a violation of her IAP, and would therefore result in her termination. Exhibit B, 122:16-19; Exhibit C, ¶47. *Plaintiff's IAP did not require termination as a response to subsequent violations.* **Cowgill Affidavit at ¶55.**

18.     Plaintiff has not heard or seen any statements made by Ms. Rowe, Wood or Williams which reflect any discriminatory bias against Plaintiff or anyone else for allegedly being disabled. Exhibit B, 216:10-18, 219:8-222:11, 222:16-222:1, 225:2-6. *Wood and Rowe made statements which implied that her job was at risk due to plaintiff's application for FMLA leave request for accommodation and noticed a significant change in Rowe's demeanor following her FMLA application showing her discriminatory intent.* **Cowgill Affidavit at ¶14 and 28.**

19.     Plaintiff has not requested an accommodation from her current employer. Exhibit B 228:2-229:5. *Ms. Cowgill requested a reduced work schedule to reduce the time she spent sitting which aggregated her back injury. Cowgill Aff. at 6,7, 11, 17, 18, 20, and 43*

20.     On January 26, 2015, First Data approved Plaintiff's request for intermittent leave in accordance with her physician's recommendation. Exhibit B, 146:7-9, 147:3-6, 152:6-153:18, 158:15-21; Cowgill Deposition Exhibit 8 (First Data's January 6, 2-15 Approval of Plaintiff's Initial Request for FMLA Leave), attached to First Data's Motion for Summary judgment as Exhibit F. Subsequently, in August 2015, Plaintiff recertified her FMLA leave and requested intermittent leave up to two days per month. Exhibit B, 161:18-163:2. On August 20, 2015, First Data once again approved Plaintiff's request for intermittent leave in accordance with her physician's recommendation. Exhibit B, 161:12-17, 163:20-164:8; Cowgill Deposition; Exhibit 10 (First Data's August 20, 2015 Approval of Plaintiff's FMLA Intermittent Leave Request), attached to First Data's Motion for Summary Judgment as Exhibit G *While Plaintiff did, in fact, recertify her FMLA request*

18

in August of 2015, First Data did not provide Ms. Cowgill the requisite reduced work schedule she requested. Cowgill Dep. at pp. 144-147 **Cowgill Affidavit at ¶22, 33, 44.**

21.      First Data instructed Plaintiff to contact the Company's Workforce Management Department whenever she needed to take time off work during the approved period and her schedule would be adjusted accordingly. Exhibit B, 147:15-148:5, 150:20-151:4. When Ms. Cowgill asked Rowe when her schedule would be adjusted, she was advised that she "was required to be at work." Cowgill Aff at ¶22.

22.      Plaintiff possesses no evidence to suggest that her alleged disability played a factor in First Data's decision to terminate her employment, much less a "determining factor." *Rowe's changed demeanor and behavior towards Plaintiff, Wood's statement implying Plaintiff's job was at stake due to her FMLA filing, and the evidence of pressure on First Data such as their mandatory overtime requirements all indicate that Plaintiff's FMLA request was a main factor leading to her termination.* **Cowgill Affidavit at ¶14 and 28.**

23.      Plaintiff has no evidence to suggest that those events were somehow conjured up by Ms. Rowe, Ms. Williams, Ms. Wood or anyone else at First Data for discriminatory reasons. *Plaintiff cites First Data's failure to produce the calls that motivated her discipline and subsequent termination as well as the Maryland DLLR's finding that she had followed the proper procedures during the second call.* **Cowgill Affidavit at ¶48, 59 and 61.**

24.      However, it is undisputed that First Data granted each and every request for FMLA leave that it received from Plaintiff. SOF, ¶¶61, 63. *Plaintiff maintains that First Data failed to provide her with a reduced schedule after both her initial request and her recertification.* **Cowgill Affidavit at ¶¶18 and 44.**

19

25.     First Data could not have unilaterally altered Plaintiff's scheduled based on that recommendation as that would have required First Data to somehow speculate regarding the specific days/ hours as well as how many days "between three and five") Plaintiff would be experiencing back and neck pain in any given week – a plainly impossible task. *Plaintiff's accommodation request only involved limiting her shifts to four hours, for three to five days per week. It required no speculation by First Data about Plaintiff's pain or discomfort level.* **Cowgill Affidavit at ¶11.**

### III.      STANDARD OF REVIEW

This Court is well aware of the standards applicable to summary judgment, so a detailed recitation of these standards is not appropriate.  Suffice it to say that Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Court must assume the truth of the nonmovant's evidence, and draw all justifiable inferences in that party's favor.  See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bayer v. US Department of Treasury,* 956 F.2d 330 (D.C. 1992).

The Fourth Circuit has prescribed a very strict standard which must be met before summary judgment may be granted. *Smith v. B & O R. Co.* 473 F.Supp. 572, 578 (D.C.Md., 1979).  Not only can there be no dispute as to the evidentiary facts, but there cannot be any disagreement as to the inferences or conclusions which might be drawn from those facts. See, e. g., *Johns Hopkins University v. Hutton,* 488 F.2d 912, 918 (4th Cir. 1973), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). Further, the party moving for summary judgment has the burden of clearly demonstrating that there is no genuine issue of fact, and any doubt as to the existence of such an issue will be resolved against it. See, e. g., *Phoenix Savings & Loan, Inc. v. Aetna Casualty &*

*Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967). Finally, the party opposing the motion is entitled to all of the favorable inferences to be drawn from the evidence. See, e. g., *Cram v. Sun Insurance Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967); *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359 (4th Cir. 1975).

## IV    ARGUMENT

### A. <u>Summary Judgment Should be Denied Because Plaintiff Can Establish the Elements of Her Claims.</u>

Plaintiff can establish through both direct evidence and the totality of the circumstantial evidence in this case that FIRST DATA terminated her because of her disability. FIRST DATA had no tolerance for and zero interest in providing Ms. Cowgill with the accommodation, limited hours for multiple days per week, while she healed from the back injury she sustained in a car accident. To the contrary, FIRST DATA's mode of operation at that time was to cut cost by laying off employees and then forced call center representatives, like Ms. Cowgill, to work mandatory overtime. As her supervisor, it was Rowe's job to promote and enforce this policy. Although Ms. Cowgill was an exemplary employee, her injury and need for FMLA and reasonable accommodations for her injury were not just an inconvenience but diametrically opposed to company policy. Consequently, FIRST DATA, through the likes of Rowe and Wood, sought to establish the requisite record, the pretext, to justify the termination of Ms. Cowgill. However, Ms. Cowgill did not make it easy for them. As a result, FIRST DATA had to manufacture and embellish two minor incidents to have a barely defensible rationale for terminating Ms. Cowgill.

### i.    <u>Ms. Cowgill Satisfies the First Three Elements of Her ADA Claim</u>

To state a *prima facie* case of wrongful discharge under the ADA, Plaintiff must show that "(1) [she] was a 'qualified individual with a disability'; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination." *Wilson v. Montgomery*

*Cty. Bd. Of Trs.*, No. PWG-17-2784, 2018 WL 4300498, at \*6 (D. Md. Sept. 10, 2018) (citing *Rohan v. Networks Presentations LLC*, 375 F. 3d 266, 272 n.9 (4th Cir. 2004).

Ms. Cowgill was unequivocally disabled under the ADA. The statute defines a "disability" in the disjunctive as a "physical or mental impairment that substantially limits one or more major life activities," or "a record of such impairment," or "being regarded as having such an impairment" by her employer. 42 U.S.C. § 12102(1). The ADA commands that this definition "be construed in favor of broad coverage of individuals . . . to the maximum extent permitted" by the statute's text. *Id* . §12102(4)(A); *see* 29 C.F.R. § 1630.1(c)(4) (noting "broad scope of protection under the ADA" and that "question of whether an individual meets the definition of disability under this part should not demand extensive analysis").

The ADA defines a "major life activity" as including "walking," "standing," "lifting," and "bending." 42 U.S.C. § 12102(2)(A). Ms. Cowgill had difficulty with her normal daily activities of standing, sitting, lifting, reaching , sleeping, working and performing manual tasks. She could not sit or stand for an extended amount of time, had limited lifting and reaching abilities, and her sleep was constantly interrupted by back pain. Some of the more mundane life activities like scrubbing in the shower and bathtub were difficult due to her injury. When reaching and bending she often irritated her back. Ms. Cowgill's doctor provided documentation of her condition and the need for reasonable accommodations.

Notwithstanding the fact that Ms. Cowgill had never been disciplined in nine years with FIRST DATA and had consistently received excellent evaluations, she was terminated for two minor, and very suspect acts of "call avoidance."

In view of the fact that Ms. Cowgill can clearly establish the first three elements of a wrongful discharge under the ADA, the thrust of Defendant's argument of summary judgment

22

rests on the contention the Plaintiff cannot establish that the circumstances surrounding her discharge raise a reasonable inference of unlawful discrimination. MSJ at p. 12 Proving that an employer's decision to terminate an employee was based on discriminatory intent rather than the employer's unbiased, albeit subjective, determination the employee's performance and/or conduct warranted termination can be difficult. However, fortunately for the Plaintiff, FIRST DATA provided all the evidence Ms. Cowgill needs.

ii.      **Summary Judgement as to Count I Should be Denied Because Plaintiff Can Show the Termination Raises a Reasonable Inference of Disability Discrimination.**

a.      **The "call avoidance" phone calls were a pretext**

A reasonable finder of fact can find that the two calls relied upon to terminate Ms. Cowgill were a pretext.  With regard to the July 10, 2015 call, Ms.  Cowgill had regularly handled calls from the caller, Mona, who was known by Ms. Cowgill and other call center representatives to be difficult. Cowgill Aff. at. ¶63. Accordingly, Ms. Cowgill knew better than Rowe or Williams what was acceptable and not acceptable with this particular client. Id at 63. An opinion bolster by the fact that the customer did not issue a negative "voice of the customer" survey like the caller in September, 2015. Cowgill Aff at ¶65. Although FIRST DATA asserts that Ms. Cowgill was "argumentative" and terminated the call prematurely, Ms. Cowgill is quoted during the call as saying "I'm not going to argue with you." MSJ at ¶29.  Finally, Ms. Cowgill asserts that she had obtained the requisite information from the customer and therefore terminated the call at the appropriate time and manner. Cowgill Aff at ¶¶64. In addition, two curious facts cannot be overlooked. Rowe reviewed and flagged this call and not the off-site QC department, who generally monitors and reviews such calls. (MSJ at ¶19 and 23), and Cowgill Aff. at ¶35-38. FIRST DATA's refusal to produce this call and then its failure to preserve this call raises the inference that it does not support Rowe's claim. **See Exhibit 14.**

As for the September 9, 2015 call, Rowe admitted that Ms. Cowgill had the right to terminate the call after her opening if there was no response. Cowgill Dep. at p. 209-210; **Exhibit 10**. Ms. Cowgill claims that she did this. Ms. Cowgill asserts that she heard a person on another call in the background when her call opened, and that she asked for the caller three times without response. Cowgill Aff. at ¶¶57-58. After she initiated the disconnect process, Ms. Cowgill heard the caller say "hello" but at that point she could not retrieve the call. Cowgill Aff. at ¶¶57-58. The DLLR judge found that Ms. Cowgill was credible on this point. Although it possessed the call at the time, FIRST DATA refused to produce this call to DLLR, and, Ms. Cowgill has never heard the call in its entirety. Cowgill Aff. at ¶59. Furthermore, it is uncontroverted that the only reason Ms. Cowgill was terminated for the inadvertent termination of a call, which is rather innocuous by any standards, because of the atypical review, especially of an employee who had not been disciplined for nine years, by Rowe. The same supervisor who ceased saying "good morning" to Ms. Cowgill after she requested leave for her injured back. Cowgill Aff. at ¶14. No one would find it reasonable to terminate someone for hanging up after waiting for someone on the other line to answer for almost thirty seconds, only to answer another call. This suggests that FIRST DATA was making a false claim not supported by the recorded evidence. A reasonable finder of fact could further reason that Ms. Cowgill exceeded her obligations under the call by remaining on the call for almost thirty seconds. Common sense suggests that if she thought to terminate the call early she could have made the three announcements within 10 seconds. Thus, her remaining on the call for almost 30 seconds, as admitted by FIRST DATA, is inconsistent with call avoidance.

Pretext can be demonstrated in a number of ways, including:

> Citing the employer's better treatment of similarly situated employees outside the Plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the Plaintiff, or other relevant

evidence that a jury could reasonably conclude evinces an illicit motive. *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Summary judgment should be granted sparingly in cases involving motive or intent. *Hollins v. Fannie Mae*, 760 A.2d at 571. Furthermore, the McDonnell-Douglas framework recognizes that "[o]utright admissions of impermissible motivation are infrequent." *Id.* (citing *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

FIRST DATA'S termination of Ms. Cowgill deviated from their standard progressive discipline process unveiling it for the rather transparent pretext it was, which provides evidence to support a reasonable inference of discrimination. FIRST DATA further buttressed Ms. Cowgill's claim for wrongful termination under the ADA by providing information about two other terminated employees who, according to FIRST DATA, were supposedly comparators to Ms. Cowgill.

### b. FIRST DATA deviated from its disciplinary policy

Like many companies, FIRST DATA had a progressive disciplinary policy, which required supervisors a range of disciplinary options. By way of example, the FIRST DATA's Harassment policy states, in pertinent part, that:

> where "possible disciplinary actions include counseling, written warning, poor job performance evaluation, loss of bonus or reduction in merit increase, demotion, transfer, suspension without pay, termination of employment or other appropriate action. **Exhibit 4.**

Rowe departed from FIRST DATA's progressive discipline by immediately placing Ms. Cowgill on an IAP without first using a written warning or other less severe disciplinary measures in accordance with FIRST DATA'S policy. A drastic first step which was noticed by Williams in Omaha Headquarters who observed that Ms. Cowgill had a long career with good evaluations. **Exhibit 12.** In her September 14, 2015 email to Rowe, Williams inquired of Rowe why she was

requesting to terminate an employee, like Ms. Cowgill, who had received 3 out of 3 rating on her annual evaluations for 2013 and 2014. **Exhibit 12.** Rowe falsely painted Ms. Cowgill as an employee with a bad attitude who had been experiencing client interaction problems. *Id.* However, there is no evidence to support Rowe's claim. Thus, a reasonable juror could answer Williams' question by realizing what changed was Ms. Cowgill's need to miss work on an intermittent basis when Rowe and the company were demanding mandatory overtime.

The discipline of Ms. Cowgill in this instance was a significant departure from its discipline of Ms. Cowgill in 2006. Early in her career, Ms. Cowgill's overall call quality ratings needed to improve. As a result, she was given only a Level One Warning for her overall subpar performance. **Exhibit 9.** Yet, following the July 2015 call, FIRST DATA inexplicably issued a Final Warning IAP for a single phone interaction. Given that the so-called comparators also received these extra levels of progressive discipline, a reasonable juror can find that FIRST DATA sought to terminate Cowgill because of her leave and need for accommodation under the ADA.

FIRST DATA will certainly argue that its policy affords it the discretion to engage in the progressive discipline or not depending the severity of the employee's conduct. Thus, FIRST DATA says Ms. Cowgill's conduct was so egregious they rightfully decided to not implement their progressive discipline steps. However, a review of the comparators' misconduct and subsequent discipline as compared to Ms. Cowgill's quickly and undeniably refutes any such argument.

Employee A was only employed for a year and one half, whereas Ms. Cowgill was an employee with a spotless record for over a decade; she had many violations that Ms. Cowgill did not, including, but not limited to; walking away from a pending call for ten minutes, using her cellular phone on the production floor, accessing an inappropriate website, and attendance issues.

**Exhibit 13.** This employee had also been on a final warning from the prior August and had been issued a "SECOND LEVEL PIP," which was also not provided to Ms. Cowgill. *Id.* As was sniffed out by Shelley Williams, and established with this "comparator" evidence, one did not get fired at FIRST DATA for the two violations allegedly engaged in by Ms. Cowgill. **Exhibit 12.** A juror could therefore reject this employee as a comparator because she was given extra levels of progressive discipline even though she was a short-timer.

Moreover, Employee A was also given special attention including reassignment of her work location so she sat next to two Team Leaders for support and assistance. **Exhibit 13** By comparison, Ms. Cowgill was not even provided the weekly coaching required under her IAP. Cowgill Aff at ¶53. This factor alone distinguishes the comparator from Ms. Cowgill. It is also evidence that the IAP was retaliatory and not intended to be constructive as designed.

The other comparator, Employee B, was also a short-term employee. **Exhibit 13.** Employee B was hired on November 17, 2017 and terminated within three months after for numerous acts of employee misconduct. **Exhibit 13.** Again, unlike Ms. Cowgill, Employee B was afforded progressive discipline not provided to Ms. Cowgill. Like Employee A, Employee B be had continuing attendance problems, and had at least three (3) violations of workplace rules, including two within a few days. **Exhibit 13.** Employee B engaged in acts such as punching in and taking excessive time to go to his desk, and then walking away from his desk and putting the merchant on hold. **Exhibit 13.** Employee B was placed on a final PIP for attendance and call avoidance. *Id.* Employee B was given a Final PIP only after engaging in two violations within 10 days. *Id.* Ms. Cowgill was placed on Final Warning only after a single, less severe violation. Employee B was ultimately terminated for insubordination when he walked away from his supervisor while the supervisor was attempting to counsel him. *Id.* As a result, the supervisor

27

requested immediate termination. Ms. Cowgill was never cited for insubordination during her entire decade plus long tenure with FIRST DATA.

The only common factor between Ms. Cowgill and the alleged comparators cited by FIRST DATA was that attendance was part of the issue; however, unlike the comparators, Ms. Cowgill's absences were lawful under her FMLA leave and needed to accommodate her disability under the ADA.

In the final analysis, the information submitted by FIRST DATA to the EEOC about the comparators establishes that there were no comparators to Ms. Cowgill, i.e., FIRST DATA could not identify another instance where it circumvented the progressive disciplinary process and terminated a low-long term employee for relatively minor infractions. *See Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396, 403-04 S.D.N.Y. 2014) ("A plaintiff may show pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons.") (internal quotation marks omitted). Moreover, by providing evidence showing that short-term poor performing employees were provided more steps in the progressive discipline process than Ms. Cowgill, FIRST DATA has more than likely ensured a reasonable trier of fact  may find that FIRST DATA's disparate treatment was motivated by Rowe's animus toward Ms. Cowgill and her desire to "show Ms. Cowgill the door" due to ADA intermittent leave.

When coupled with facts such as: FIRST DATA's deviation from its progressive disciplinary measures with regard to Ms. Cowgill; Ms. Cowgill's spotless record since 2006; Rowe's sudden animus towards Ms. Cowgill; and the DLLR Judge's finding that Ms. Cowgill

followed procedure; this case warrants consideration of by the trier of fact, and not a favorable ruling on the MSJ.

c. **The real reason FIRST DATA terminated Ms. Cowgill was due to animus for her ADA leave.**

A reasonable juror can find that FIRST DATA, by Rowe and others, held animus against Ms. Cowgill for not being able to come to work regularly due to her disability and thus needing to avail herself of the FMLA and ADA. This animus was on full display since she made her request for leave. There is Ms. Rowe's nasty refusal to greet Ms. Cowgill when she greeted Rowe; the allegedly inadvertent Final Warning issued against Ms. Cowgill for taking her approved FMLA and ADA leave; the litany of comments directed to Ms. Cowgill by Rowe and Williams suggesting that she better "play nice" to protect her job and that she was "required to be at work"; the demand for Ms. Cowgill to work contrary to her physician's order thereby placing her health at risk; and the deviation from company policy to Ms. Cowgill's determent. Further evidence of animus is Ms. Rowe and Ms. Woods' refusal to register a harassment policy complaint and investigate Ms. Cowgill's claim that there was a "target on her back" and Ms. Cowgill "suddenly" could not do anything right after she obtained FMLA leave. Cowgill Aff. at ¶48. FIRST DATA'S failure to follow its Harassment policy is not insignificant. If Woods and Rowe had adhered to the policy, Williams, the Corporate HR Director and decision maker, would have immediately known something foul was afoot when Rowe requested permission to terminate a long-time, high performing employee. She would not have to rely on Rowe's false claim that Ms. Cowgill's performance had been in decline for some time.

d. **The timing of Ms. Cowgill's termination supports a reasonable inference of discrimination.**

Defendant correctly points out that the court may look at the temporal proximity between when the employee informs the employer of their disability or requests relief under the FMLA or ADA for that disability and when the employee suffers an adverse action by the employer to

determine whether discrimination has occurred. MSJ at p. 13. The Fourth Circuit commands that "temporal proximity" between protected activity and adverse employment action is enough, by itself, to raise an inference of causation as a matter of law. *King v . Rumsfeld , 328 F.3d 145* , 151 & n.5 (4th Cir. 2003) (finding 10 week period sufficient to create inference of causation); *Silva v . Bowie State Univ* ., 172 F. App'x 476, 478 (4th Cir. 2006) (same); *see Jacobs v . N . C . Admin . Office of the Courts , 780 F.3d 562* , 575, 579 (4th Cir. 2015) (holding three week gap sufficient to establish_causation for both retaliatory and discriminatory firing under ADA). The Defendant then proceeds to cherry-pick some facts, i.e., that Cowgill was terminated nine (9) months after requesting leave under the FMLA, to suggest the timing of Ms. Cowgill's termination bolsters the conclusion that her performance was the sole determining factor in FIRST DATA'S decision to terminate her. However, a closer, more comprehensive review of the facts suggests a continuing, escalating pattern of an unlawful disparate disciplinary actions, verbal harassment, and intimidation tactics culminating with Ms. Cowgill's termination.

The harassment of Ms. Cowgill for protected activity began almost immediately after she requested FMLA leave and ADA accommodation. Rowe's attitude changed immediately. She ignored Ms. Cowgill and could barely even bring herself to greet Ms. Cowgill in the morning to her. Within a couple weeks of requesting FMLA, Ms. Cowgill was issued a Final Warning for using the leave granted her under the FMLA. The Final Warning for attendance foreshadowed FIRST DATA's intent to terminate Ms. Cowgill due to her intermittent leave. Although Wood never admitted it was a mistake at the time, FIRST DATA now conveniently contends it was simply "mistake." but the facts belie this contention.

Rowe, who helped process Ms. Cowgill's FMLA request was the same person who issued the Final Warning for missing time at work; leave that was approved by the vary FMLA request

30

she had recently processed. It strains credulity that with a couple weeks she forgot Ms. Cowgill was entitled to FMLA leave and mistakenly cited her for unapproved absenteeism. Ms. Cowgill's view of the incident is much more plausible. She insists that it was not a mistake, she was never told it was a mistake and, in Ms. Cowgill's opinion, it was the first "shot across the bow." A warning that FIRST DATA, irrespective of her legal right to take the leave, would not tolerate any absences or intermittent leave regardless of the law.[4]

Additional facts related to timing helps to establish FIRST DATA'S discriminatory intent. The administration of Ms. Cowgill's first valid discipline during her decade plus tenure with FIRST DATA, the IAP issued in August of 2015, was contemporaneous with a discussion regarding the recertification of her leave and need for reasonable accommodation. It was no coincidence that Rowe begin the August 4th meeting regarding the untimely, specious discipline for a call in early July by questioning Ms. Cowgill as to whether she planned to renew her request for leave under the FMLA and accommodation under the ADA. If nothing else, the discussion of this protected leave in the context of providing Ms. Cowgill her first and only warning before her termination is suspicious. It also creates a question of fact as to whether the IAP, the precursor for the termination, was a genuine disciplinary measure or both retaliation for her use of the ADA for reasonable accommodation and the first step in FIRST DATA developing the pretext to justify her termination a month later. Thus, the timing, the termination of Ms. Cowgill within six weeks of her first IAP in nine years, actually bolsters Ms. Cowgill claim that she was wrongfully discharged under the ADA, and not FIRST DATA's defense to that claim.

---

[4] A reasonable juror can find that after First Data was caught by Ms. Cowgill violating the ADA and FMLA immediately after her request for FMLA leave due to her disability, Rowe and her management decided to bide their time until their next attempt to fire her.

Finally, FIRST DATA'S temporal proximity argument cannot mask the inference of discrimination established by the facts, e.g., the departure from company progressive discipline practice; the application of harsher discipline standards; the animus to her disability, and the inconsistent and false statements as to why Ms. Cowgill was terminated. The "timing" that is critical to the Court's analysis is simply that before she requested leave to accommodate her disability she was undeniably a exemplary employee, but soon after she became a problem employee. Thus, a reasonable juror could find that there was a target on Ms. Cowgill's back from the moment she requested leave due to her disability.

### iii.   Summary Judgment Should be Denied as to Count II Because FIRST DATA Failed to Provide Ms. Cowgill the Reasonable Accommodation She was Entitled to Under the ADA

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show: "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar General Corp*., 717 F.3d 337, 345 (4th Cir. 2013) (alterations in original omitted) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

As discussed previously, Ms. Cowgill has clearly established a *prima facie* case, and therefore the burden shifts to FIRST DATA to produce a legitimate, non-discriminatory reason for the termination. *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 513 (4th Cir. 2006). If FIRST DATA meets this burden, then "the presumption of discrimination created by the *prima facie* case disappears from the case and Ms. Cowgill must prove that FIRST DATA's proffered justification is pretextual.'" *Id*. at 514 (*quoting Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004)).

32

On the issue of whether the inability to sit for a prolonged period of time constitutes a disability or not, this is for the jury to decide under the facts and circumstances of this case. *Parada v. Banco Industrial de Venezuela, C.A.*, 753 F.3d 62, 69 (2d Cir. 2014). Ms. Cowgill's condition was not transitory but rather chronic. See **Exhibit 16** (her condition was worsening six *months* after the accident) *Allen v. Baltimore Cnty* 91 F.Supp 3d 722, 731 (D. MD. 2015) (discussing how an episodic impairment is a disability and that even a "temporary" impairment can be a disability under the ADA). She was perceived as, and treated as. disabled by FIRST DATA, who approved a reduced work schedule but then failed to honor it. A reasonable juror can find that Cowgill's allegation that recertification of her reduced schedule for another six months was the impetus for her termination. Cowgill Dep at pp. 201-202; 204. A reasonable juror can find that FIRST DATA and Rowe held animus against Ms. Cowgill due to her disability based on the fact that: (1) it immediately sought to set her up for termination for taking the approved FMLA leave; (2) it later departed from the company's progressive discipline practices; (3) it applied the more lenient, progressive disciplinary measures to Ms. Cowgill's "comparators" (4) it terminated her for an objectively minor infraction; and (5) the temporal proximity between the recertification of her leave, the IAP, and her termination. Ms. Cowgill "must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his [adverse employment action] were in fact a coverup for a [ ] discriminatory decision." *McDonnell Douglas*, 411 U. S. Reports 805 (1973).

### a. Cowgill's request For FMLA standing alone was a request for reasonable accommodation under the ADA.

The discussion *infra* at pp. 32-33 shows that Ms. Cowgill was disabled under the ADA and that she requested accommodation as required. Furthermore, her request for FMLA, without more, can constitute a reasonable accommodation under the ADA. *Capps v . Mondelez*

33

*Glob ., LLC*, **847 F.3d 144** , 156 (3d Cir. 2017) ("We recognize that a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA, *see* 29 C.F.R. § 825.702(c)(2) . . . .").

   **b.**  **FIRST DATA failed to engage in the required interactive dialogue and failed to accommodate Ms. Cowgill's disability.**

 A reasonable juror can find that FIRST DATA refused to provide Ms. Cowgill her requested accommodation, was advised of her opposition to this refusal and her request to honor it, in a pattern of conduct constituting a refusal to engage in the interactive process to ensure that Ms. Cowgill was accommodated. The "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Wilson v . Dollar Gen . Corp .*, 717 F.3d 337 , 347 (4th Cir. 2013) ( *citing Jones v . Nationwide Life Ins . Co .*, 696 F.3d 78 , 91 (1st Cir. 2012)).

 FIRST DATA was provided notice of Ms. Cowgill's disability and need to work shorter shifts due to her disability. Ms. Cowgill avers that Rowe ignored this notice and refused to provide her the reasonable accommodation. Rowe also refused to engage in the interactive process when Ms. Cowgill advised her that her disability was not being accommodated, and, instead, emphatically told her three times that she is "required to be at work". This failure to work with Ms. Cowgill in the interactive process and failure to accommodate are violations of the ADA. *Allen v. Baltimore Cnty* at 733 (D. MD. 2015) (once accommodation request made duty of supervisor to engage in interactive process when he or she observes the employee having such disability problems). Ms. Cowgill raised with Rowe on numerous occasions that her modified schedule was not being honored and that she was being required to sit for excessive periods of time. Instead of providing her with the requisite four (4) hours of leave for three (3) to five (5)

34

times per week as her physician recommended, she was forced to work eight plus hours per day, which negatively impacted her body's ability to heal.

## Conclusion

WHEREFORE, based on the foregoing law and facts, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

Terri Cowgill
Plaintiff, *Pro se.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of October 2020, the foregoing was filed with the Clerk of Court and served to the following counsel of record via first class mail and email:

Bryan J. Harrison, D. Md. Bar # 19165
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW, Suite 700
Washington, D.C. 20004
Telephone:  (202) 508-6010
Facsimile:  (202) 508-6200
E-mail:  bryan.harrison@bclplaw.com

/s/ Terri Cowgill
Terri Cowgill
Plaintiff, *Pro se.*

35