# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TERRI COWGILL, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) CASE NO. 1:19-cv-02565-ADC |
| FIRST DATA TECHNOLOGIES, INC., and FISERV SOLUTIONS, LLC, | ) ) ) |
| Defendants. | ) ) ) ) |

## AFFIDAVIT OF TERRI COWGILL

Now comes before me Terri Cowgill who sworn and deposed now states:

1. I am over the age of 18 and I have personal knowledge of the facts set forth herein and I am competent to testify to the matters set forth herein.

2. I served as a Call Center representative at First Data for over eleven years, from July 5, 2004 to September 14, 2015

3. For almost nine years I retained a spotless disciplinary record until I was suddenly disciplined during the final two months of my employment and terminated shortly after. Further, prior to becoming disabled, I was never disciplined or placed on an Improvement Action Plan ("IAP"), except for a 30 day IAP in September, 2006

4. I routinely received above-average performance reviews during my tenure at First Data, which is shown by my 2014 year-end review, and my 2015 mid-year review.

5. On January 5, 2015, I was in a serious car accident which injured my back, causing me to experience back and neck pain as well as headaches.

6. To date, I am unable to engage in normal daily activities such as standing, sitting, lifting, reaching, sleeping, working, or performing manual tasks such as bending over or even washing myself without experiencing significant pain.

7. This pain has caused me to be unable to sleep soundly and has affected my everyday life by limiting my ability to work, sit, or stand.

8. This injury and the related pain are permanent.

9. After my accident, and because of these injuries, I requested medical leave from First Data under the Family and Medical Leave Act ("FMLA").

10. Due to my injuries and disability, my FMLA request also constituted a request for reasonable accommodation under the Americans with Disabilities Act ("ADA").

11. Specifically, my request was for intermittent leave to attend regular physical therapy sessions, and to reduce my schedule to four hours per day, three to five days per week.

12. I was advised on January 26, 2015 that my request had been retroactively approved as of January 15, 2015, but I experienced immediate retaliation from First Data.

13. Dawn Rowe ("Ms. Rowe") was my supervisor at the time when I first submitted my request for FMLA leave and reasonable accommodation under the ADA, and her attitude towards me noticeably shifted after I had submitted the request.

14. Ms. Rowe's shift in attitude was shown in part by her refusal to respond and/or to barely respond when I greeted her every morning following my submission.

15. Further, Ms. Rowe's conduct shows that she was unwilling to make any accommodation pursuant to my request.

16. At or around the time of my injury, First Data was engaged in the process of large-scale employee terminations.

17. Following the indications made by Ms. Rowe's conduct, First Data allowed me to take leave for physical therapy, but failed to comply with my request to limit my shifts to four (4) hours, continuing to schedule me for times that conflicted with my treatment, and forcing me to sit for prolonged periods of time.

18. As a result of First Data's failure to grant my request for limited hours, I was forced to sit for prolonged periods at work contrary to my physician's instructions regarding my FMLA and ADAA requests.

19. In addition to failing to comply with my requests, First Data also failed to engage in an interactive dialogue with me regarding my accommodation requests, which is required under the ADA.

20. On several occasions, I raised First Data's failure to comply with my accommodation requests in conversations with Ms. Rowe, and yet First Data still did nothing to address it.

21. Due in part to the spotless record that I held for almost nine (9) years, my issues at work did not begin until after I filed the leave papers for my FMLA request.

22. Within a month of my original accommodation request, Ms. Rowe issued me a Final Written Warning ("Final Warning") on February 11, 2015. During a meeting with Ms. Rowe about the Final Warning, I asked about my request for a reduced schedule several times, each time Ms. Rowe had the same emphatic response, "you are required to be at work." After the third time, the message was loud and clear, i.e., don't expect a reduced schedule and don't ask about it again.

23. This Final Warning was related to taking the time off because of the pain related to my back injury that I requested under the FMLA, which was classified by First Data as an unexcused absence.

24. Prior to my accident and subsequent accommodation request, I did not have any issues regarding my attendance, which was apparently the basis for First Data's issuance of the IAP.

25. This Final Warning was the first attempt that First Data made to discipline me, with no prior warnings or attempts to engage in progressive discipline despite its policy mandating that such measures be used.

26. At the time that First Data issued the Final Warning, it was engaging in large-scale terminations, having issues regarding service of customers, and requiring employees to work mandatory overtime to meet its needs.

27. In response to the issuance of the Final Warning, I had a pointed discussion with Annette Wood, the First Data Human Resources Representative ("Ms. Wood"), stating that First Data was unlawfully retaliating against me because of my request.

28. During these discussions, Ms. Wood told me that I needed to do what I had to do to "protect" my job, which was confusing because I didn't understand why my job would be at risk in any way for exercising my rights under the FMLA and ADA for my disability other than the fact that First Data was requiring its employees to work mandatory overtime.

29. Consequently, I concluded that Ms. Wood's statement was a threat against me for not being able to work as scheduled because of my injury.

30. Despite my pleas, to my knowledge, there was no investigation of my claims to my knowledge, and I was never notified that First Data's issuance of the Final Warning was a mistake in any way.

31. I believe that the Final Warning was issued in order to intimidate me into abandoning my request for FMLA leave and ADA accommodations.

32. 32. During my February, 2015 meeting with Ms. Wood, which was after I complained about the FMLA and ADA violations, Ms. Wood advised me that First Data had removed its Final Warning because I was "a good rep", showing her belief that First Data had not violated the law through its actions.

33. Over the next several months, I took leave for my physical therapy, but I never received the reduced schedule that I was entitled to under the FMLA and ADA.

34. On August 4 of that year, I was disciplined for a call that I handled earlier on July 10, 2015 with a customer known to be difficult to deal with and I was placed on an Improvement Action Plan ("IAP").

35. This was highly unusual to me, because First Data has a policy of reviewing questionable calls within two (2) days. First Data substantially deviated from its procedure in this case by waiting almost a month to address my call before placing me on the IAP.

36. Despite the fact that I was monitored continuously in my time at First Data, this was the first time that I was disciplined concerning my conduct on phone calls.

37. Ordinarily, my calls are monitored by First Data's Quality Control Department ("QC"), which is not staffed by management employees.

38. I had never been disciplined because of my conduct on a call identified and monitored by QC. I was disciplined in August of 2006 with a Level One Warning pursuant to First Data's procedures at that time.

39. At the time of my August 4, 2015 discipline, I was rated at a 3 on a scale of 1-3 for my job performance.

40. This latest IAP was issued by Ms. Rowe and coincided with the upcoming recertification of my reasonable accommodation requests.

41. This was the first instance of direct discipline or warning, for a call that I had ever received from Ms. Rowe in the five (5) years that she was my supervisor.

42. On August 4, 2015, I met with Rowe and discussed the IAP.

43. Before even putting me on the IAP, Ms. Rowe brought up my pending FMLA and ADA recertification, which anticipated the need for a reduced schedule through February of 2016.

44. I told Rowe that I needed to recertify my accommodation requests. First Data again did not provide the relief requested, and upon hearing that I needed to renew my leave request, Rowe proceeded with the IAP.

45. During the course of my treatment, my doctor expressed concern that First Data's Failure to provide a reduced schedule was affecting my healing., First Data expressed no concern for the impact their conduct had on my health.

46. At the time that I filed to recertify my FMLA and ADA requests, First Data was still requiring call center representatives to work mandatory overtime

47. This new IAP was based on the single call mentioned above and did not correctly identify my job performance on that call.

48. Once I received the IAP, I immediately raised the issue of retaliation for my disability, and asked Ms. Rowe if I had a target on my back.

49. After I raised this issue to Ms. Rowe, there was no further action taken despite the fact that it was company policy for supervisors to investigate such claims.

50. Prior to issuing the IAP in August, 2015, First Data had not issued any warnings or discipline against me and had not initiated any coaching prior to its issuance of the IAP.

51. I believe that First Data circumvented its own progressive discipline policy because I had mentioned that I would be recertifying my FMLA request at the beginning of my meeting

with Ms. Rowe, and I believe that the original Final Warning was never actually removed from my file.

52. I did not elevate my complaint about possible retaliation to Ms. Wood because I believed that it doing so would be futile; Ms. Wood had already violated the FMLA and ADA by punishing me for my attendance following my accident, and she showed her disregard for those laws by stating that the reason for retracting the Final Warning was because I was a "good rep," and not because it was their mistake and illegal.

53. The IAP that I had received after the call did not require immediate termination for another call center violation but did require weekly meetings where Ms. Rowe would coach me. Rowe never had these meetings with me.

54. Once I actually received the IAP, I told my co-worker Amanda Parmer that I believed that I was being disciplined because Ms. Rowe was "pissed" at me because of my intermittent FMLA leave.

55. On September 14, 2015, I was terminated for allegedly releasing a call too early even though my current IAP did not require such action in response to a subsequent violation, and even though I had not received any coaching from Ms. Rowe.

56. When I was terminated, I was on intermittent leave through February of 2016.

57. The termination request came from Ms. Rowe and was filed because I allegedly hung up a call too early. However, on that call, I could not hear anyone on the other end of the line, and I followed company protocols by asking if anyone was on the line three (3) times. When I met with Ms. Rowe about the call, she asked if my equipment was working correctly. I told her I didn't know if it was or not.

58. To my recollection, on that call, no one responded to my greetings, and I only heard voices in the background, so I initiated a disconnection. After I did so, I heard a man say "Hello?" and I attempted to reconnect the call, but it was irretrievable.

59. To date, First Data has also refused to produce a copy of this phone call, even when requested by the Maryland Department of Labor and Licensing ("DLLR").

60. During a hearing conducted by the DLLR, my testimony was taken along with Rowe's, and the DLLR found that company policy allowed me to hang up if no one was responding on the call, and further, that I had given the introduction and followed the appropriate procedures to the call.

61. I firmly contest the veracity of First Data's statement in Shelley Williams's memorandum to the DLLR that I engaged in a discussion with caller on the September call and hung up after advising the customer that I was not going to argue with them.

62. Ms. Rowe admitted to the DLLR that I was permitted to release a call if there was no response.

63. With regard to the July 10, 2015 call, I regularly handled calls from the caller, Mona, who was known by me and the other call representatives to be difficult. Given my experience with the caller, I believe that I had a better idea of what behavior was or was not acceptable when dealing with that client.

64. While First Data asserts that I was argumentative on Mona's call and that I terminated the call prematurely, I was quoted as saying that I was not going to argue, and I waited to terminate the call until after I obtained the requisite information.

65. Mona did not issue a negative "voice of the customer" survey following her call.

66. I do not believe that I was terminated for my conduct on any phone call, but rather First Data misstated the events of those calls so that they could use them a pretext for my termination.

**I SOLEMNLY DECLARE AND AFFIRM UNDER PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE, AND BASED UPON MY PERSONAL KNOWLEDGE.**

*/s/ Terri Cowgill*
Terri Cowgill