# EXHIBIT 1

```
 1   TERRI COWGILL,                    IN THE

 2           Plaintiff,                UNITED STATES DISTRICT
                                       COURT
 3
     vs.                               FOR THE DISTRICT OF
 4                                     MARYLAND
     FIRST DATA TECHNOLOGIES, INC.,
 5
             Defendant.                CASE NO.
 6                                     1:19cv-02565-ADC

 7   _____/

 8

 9

10           The deposition of TERRI COWGILL was held on

11   Friday, August 21, 2020 commencing at 9:47 a.m. at the

12   Regus, Westview Village Business Center,  5100

13   Buckeystown Pike, Frederick, Maryland  21704 before Eric

14   Leichter, Notary Public.

15

16

17

18

19

20

21   REPORTED BY:  Eric Leichter
```

1  be a -- a -- a negative response to that call?  The --

2  the -- the caller was not happy?

3       A     Oh, yeah.

4       Q     Okay.  And Ms. Rowe shared with you that a

5  caller had completed a survey and wasn't happy?

6       A     Correct.

7       Q     Did she tell you what the caller had said

8  or what was communicated that the caller wasn't happy

9  about?

10      A     I -- something to the effect that I hung up

11 on him without giving service.

12      Q     Okay.  Did she review the call with you?

13      A     Correct.

14      Q     She played the call and you listened to it?

15      A     Correct.

16      Q     And what did that call or what did that

17 recording of the call reflect?

18      A     A man talking in the background to someone.

19      Q     Okay.  And did you ever engage in any

20 service with that customer or client?

21      A     Not that -- or not on the recording that

1  was played for me.

2      Q    Okay.  Could you hear your breathing or
3  your -- or your salutation to the customer?
4      A    No.  The only thing that could be heard was
5  a man talking to someone else in the background.
6      Q    That could be heard throughout the entirety
7  of the recording?
8      A    Correct.
9      Q    And then you hear the call become
10 disconnected?
11     A    Well, no.  At the end, right when I was
12 disconnecting, he said hello.  And -- but it was already
13 too late.
14     Q    But you could hear somebody talking in the
15 background?
16     A    Correct.
17     Q    And during the entirety, if you can hear
18 somebody talking in the background, you cannot hear
19 anything you're saying?
20     A    Correct.  On the recording, you're asking
21 me?

1    A    No.

2    Q    Okay.  What I previously --

3    A    What --

4    Q    What I previously asked you about then, a

5  -- the August 4, 2015 meeting and you're not escalating

6  that, and you said you had not.  You hadn't complained

7  to anyone in HR or her -- Dawn Rowe's manager or anyone

8  else in the company.  Why -- why didn't you?  Why did --

9  if you thought it was not correct or that you hadn't

10 been argumentative and hadn't prematurely hung up the

11 call, why didn't you --

12   A    During --

13   Q    -- bring that or adjust it or try to

14 escalate it?

15   A    During the August 4th?

16   Q    Yeah.

17   A    Well --

18   Q    On that first one.  Yeah.

19   A    Well, because the next step would've been

20 HR, and, obviously, in February, they were tiddling

21 [sic] to help.

1        Q      Oh, I don't -- I'm sorry.

2        A      In February, the final IAP I got put on for

3   attendance, when I took that to HR, they were no help at

4   all, so, why would I take a call back to them again and,

5   you know, lodge another complaint against my manager

6   when they did nothing the first time?

7        Q      Okay.  Let me -- let me just explore that a

8   little bit.  As I understand the facts, in February, you

9   were placed on an IAP for attendance?

10       A      Correct.

11       Q      And that was -- and you had -- and some of

12  the days in which you were charged with attendance

13  violations were actually days that were FMLA days?

14       A      Correct.

15       Q      And you complained about that or you raised

16  that as an issue.  Correct?

17       A      Yes, I did.

18       Q      And ultimately, the company retracted that

19  -- that discipline, that IAP?

20       A      That's what they said.

21       Q      Well, they -- they told you that they were

1  retracting it.  Correct?

2      A    Correct.

3      Q    Okay.  And so, you -- did you complaint to

4  HR about that?

5      A    Correct.

6      Q    And you got exactly the result you wanted,

7  which was that IAP retracted.  Correct?

8      A    Well, I believe what I told Annette Wood or

9  I know what I told her is that I was being harassed, and

10  that now, Dawn was threatening my job.  So, I mean, if

11  you want my opinion, I don't believe that there was ever

12  an IAP for attendance to begin with.

13     Q    You don't believe it should've been issued

14  in the first place?

15     A    No.  I think that was just one of their

16  harassment tactics.

17     Q    Okay.  But in any event, when you brought

18  it to the company's attention that the absences you were

19  charged with were actually protected under the Family

20  and Medical Leave Act because you'd been approved for

21  intermittent leave, the company withdrew and retracted

1    that discipline.  Correct?

2         A     According to Annette Wood, it was based on

3    the fact that Dawn Rowe -- that because I was such a

4    good rep, Dawn Rowe had vouched for me.  It wasn't

5    released -- it wasn't taken back because it was done in

6    error for FMLA or anything like that.  She sit there and

7    she either called Dawn or she pretended to call Dawn and

8    come back and said that because I was such a good rep,

9    she was gonna have it erased was her word.

10        Q     Okay.  Getting back to my other question

11   then, you're saying because of the manner in which HR

12   engaged with you regarding your issues in February, you

13   thought that there was no point in challenging that

14   discipline or IAP you received in August 4, 2015.

15   Correct?

16        A     Correct.

17        Q     Okay.  How about your termination of

18   September 15, 2015?  Did you escalate that Ms. Rowe's

19   manager?

20        A     No.

21        Q     Did you escalate that to HR?

1   I told her it was scheduled.  I said, I've already

2   scheduled it.  If you go ahead and get my schedule

3   reduced, I'll try to make it because if you look at the

4   IAPs, we're supposed to -- or I'm sorry.  If you look at

5   the approvals of the late management, time off and

6   stuff, we're supposed to schedule doctor's appointments

7   and stuff outside of our normal work hours.  Well, if

8   they didn't give me normal work hours, then, you know,

9   reduce it to four hours.  There was no way I could

10  schedule it so that it didn't interfere with work.  Does

11  that make sense?

12       Q    I -- I understand what you're testifying

13  to.

14       A    Okay.  Well, what I'm trying to say to you.

15  Because they did not say, okay.  You have Monday,

16  Wednesday, and Fridays off.  That's your three days per

17  week.  Then I could've scheduled my going to my doctor

18  and said, okay.  I need my physical therapy for Monday,

19  Wednesday, and Friday.  They never did that.

20       Q    But to be clear, they said if you needed to

21  go at physical therapy, you should just go.  Call

1  Workforce Management and go.

2     A    Dawn told me whenever I left for physical

3  therapy to call Workforsh [sic] -- Workforce Management

4  and they would take care of my schedule.  Correct.

5     Q    All right.  So whether you were on the

6  schedule or not, nobody said you couldn't have that

7  time?

8     A    Not for physical therapy.  Correct.

9     Q    Okay.  Well, was there any other time that

10  you needed to have off for that they didn't give you

11  time off for?

12     A    Yeah.  He wanted me reduced to four hours

13  per day so I wasn't sittin' for eight to ten hours.  He

14  said -- or he believed that would help my back to heal.

15     Q    Okay.

16     THE WITNESS:  While I'm thinkin' about it,

17  do I get a copy of this deposition also, or can I

18  request a copy of it?

19     MR. JELLINEK:  You can.

20     THE WITNESS:  Okay.

21     Q    Ms. Cowgill, I'm gonna hand you a document

1       A       Correct.

2       Q       Attempt to schedule doctors during nonwork

3   hours?

4       A       Right.

5       Q       Notify if there's any changes.  You'll need

6   to be recertified after this period ends.

7       A       Correct.

8       Q       Contact Leave Management if you exceed the

9   approved frequency above.  Following your business

10  unit's call-in procedures.  And doesn't make your

11  absences as FMLA when calling in.  Correct?

12      A       Correct.

13      Q       So the company's -- and the Leave

14  Management team, what is that?

15      A       It's just the department as far as I know

16  during -- that handles first-status employees' request

17  for leave of absence or FMLA or I don't know for what --

18  like they're a branch off of HR.  Well, I guess 'cause

19  it says First Data HR Service Center.

20      Q       Okay.  So after you'd been approved for

21  this leave, was there ever any day where you had worked

1  four hours per day on the schedule and you said, I -- I

2  can't work anymore so I'm gonna go tell Dawn Rowe I've

3  had enough.  I'm gonna just -- I'm not -- I -- I gotta

4  go.  Pursuant to my FMLA intermittent leave, I'm telling

5  Workforce Management I gotta go today and I'm -- I'm not

6  working?

7       A     Not four hours.  I did leave one day.  I

8  just stood up and put on my coat.  She was across the

9  room and she come walking towards me and asked me if I

10 was okay.  And I said, no.  I'm going home.

11      Q     And what did she say?

12      A     Nothin'.

13      Q     Did you call in to Workforce Management,

14 said, I'm taking this time off for FMLA?

15      A     Yeah.  I woulda had to do that and call her

16 extension before I even left, so I'd done that before I

17 even stood and put on my coat.

18      Q     On any day where you were on the schedule,

19 did you ever -- and you felt like it's just too

20 uncomfortable to work today, you know, I -- I really --

21 I -- I just can't come in, did you ever call Dawn and

1   required that you be scheduled off one to two days a

2   month.  Correct?

3        A     I believe it said that I could experience

4   flare-ups.

5        Q     And so the company had approved you for

6   that.  When you have a flare-up, let us know and it's

7   approved for intermittent leave?

8        A     Correct.

9        Q     Do you recall ever -- any instance after

10  that had been approved where you actually had to say,

11  I'm having a flare-up today.  I can't come in?

12       A     I can't recall.

13       Q     Okay.  So, as you sit here today under oath

14  of this deposition, you can't recall any other time

15  after you'd been approved for that leave in August 20 of

16  2015 where you requested a time off and nobody didn't

17  give you the time off?

18       A     Correct.  Because that would -- be what?

19  Like a month before I was terminated.

20       Q     Right.  You were terminated on September --

21       A     September --

1   see him like two days later, he did an MRI again.

2       Q      All right. The next individual that I want

3   to check with you about in your list of people with

4   knowledge, you listed Annette Wood. Who is Annette Wood?

5       A      She was an HR representative at First Data.

6       Q      All right. And what information or

7   knowledge do you believe she has that would be relevant

8   to the matters at dispute in this lawsuit?

9       A      She knows -- after that February 11

10  incident where I got put on a final written warning for

11  attendance, she was told that Dawn Rowe was harassing me

12  and threatening my job.

13      Q      And by that you meant giving you this --

14  the write-up for the attendance?

15      A      Correct.

16      Q      Anything else?

17      A      As far as harassing --

18      Q      Yeah.

19      A      -- and -- not that I can recall.

20      Q      All right. And then Dawn Rowe is the next

21  person listed. We've talked about her quite a bit. She

1    was treated more favorably than you for similar conduct?

2         A    I don't have access to who is on

3    improvement action plans and whofs not.

4         Q    Do you believe you possess any physical

5    condition that prevents you from working?

6         A    Today? No. No, I get up and go to work

7    every day. It doesn't mean I don't have aches and pains,

8    but --

9         Q    The pain that you said you experience in

10   your back and your neck, does it prevent you from doing

11   any -- any normal daily activities?

12        A    Sometimes.

13        Q    Such as?

14        A    Like I told you that one day my back does

15   tend to lock up. So just sitting for long periods of

16   times or riding in a car for long periods of times or

17   bending over in my shower scrubbing it. I have to take

18   breaks. I mean, I can still work, but --

19        Q    Have you been experiencing any discomfort

20   today as you've sat here through today's deposition?

21        A    I mean, it's uncomfortable. I keep

```
 1  State of Maryland

 2  City of Baltimore, to wit:

 3      I, Eric Leichter, a Notary Public of the State of

 4  Maryland, Baltimore City, do hereby certify that the

 5  within-named witness personally appeared before me at

 6  the time and place herein set out, and after having been

 7  duly sworn by me, according to law, was examined by

 8  counsel.

 9      I further certify that the examination was recorded

10  stenographically by me and this transcript is a true

11  record of the proceedings.

12      I further certify that I am not of counsel to any

13  of the parties, nor in any way interested in the outcome

14  of this action.

15      As witness my hand this 24th day of August, 2020.

16

17                          _Eric M. Leichter_____

18                          Eric Leichter

19                          Notary Public

20  My Commission Expires:

21  January 13, 2024
```